John and Joan DOE, et al., Appellants,

v.

Donald J. DEVINE, Director, Office of Personnel Management, et al.

No. 82–1565.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 1983.

Decided April 1, 1983.

---

62. *See* note 3, *supra.*

Peter E. Scheer, Washington, D.C., with whom Joseph N. Onek, Joel I. Klein, Martin J. Gaynes, and Armin U. Kuder, Washington, D.C., were on brief, for appellants.

R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth, Asst. U.S. Atty., and Henry G. Watkins, Associate Gen. Counsel, Office of Personnel Management, Washington, D.C., were on brief, for appellees, Devine, et al.

Philip S. Neal, Washington, D.C., with whom Terry Bancroft Dowd, and Stephanie A. Stahr, Washington, D.C., were on brief, for appellee, Blue Cross and Blue Shield Association.

Leonard W. Belter and Daniel F. Stenger, Washington, D.C., were on brief, for appellee, Aetna Life Ins. Co.

Before TAMM and GINSBURG, Circuit Judges and PECK,[*] Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

This case concerns the approval by the Office of Personnel Management (OPM) of reductions in mental health benefits in the 1982 "Government-Wide Service Benefit Plan" offered to federal employees and annuitants under the Federal Employees Health Benefits Act (FEHBA). Plaintiff-appellants [1] contend that OPM's approval of

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Plaintiff-appellants include individual federal employees and relatives of employees currently receiving long-term psychiatric care, and or-

the reductions was arbitrary and capricious within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because the cutbacks seriously and unnecessarily undermined the policy expressed in FEHBA section 8904, 5 U.S.C. § 8904,[2] that federal employees have the opportunity to purchase "catastrophic" coverage for severe or extended illness. For the reasons set forth below we conclude that OPM's negotiations and final contract with Blue Cross and Blue Shield Association ("Blue Cross-Blue Shield"), the insurer that offers the government-wide service benefit plan, rationally accommodated FEHBA's several competing goals. We therefore affirm the judgment of the district court, which held that OPM did not abuse its wide discretion in arranging for federal health insurance benefits. *Doe v. Devine*, 545 F.Supp. 576 (D.D.C.1982) [hereafter, "District Court Opinion"].

## I. BACKGROUND

### A. *Overview of FEHBA*

FEHBA creates a subsidized health insurance system for federal employees. The system is competitive—in 1981, 121[3] insurers participated. During a four-week "open season" held each year[4] federal employees may select the plan that best fits their insurance needs and budget. The government's subsidy is set at sixty percent of the average subscription costs of the six largest plans.[5] Employees pay the balance of the premiums due on the particular plan they select.

Insurers may offer four types of coverage: 1) a government-wide "service benefit plan"; 2) a government-wide "indemnity benefit plan"; 3) "employee organization plans"; and 4) "comprehensive medical plans."[6] OPM is responsible, under FEHBA section 8902(a), for negotiating and approving the terms of all plans offered to FEHBA subscribers.

OPM may negotiate one government-wide service benefit plan, and one government-wide indemnity benefit plan. Every federal employee is eligible to join these plans. The service benefit plan has, historically, offered broad "first dollar" coverage (full payment for the charges incurred by patients in the early stages of illness) while the indemnity benefit plan has required coinsurance (cost sharing by the patient and the insurer) from the earliest stages of treatment. FEHBA section 8904 directs that both government-wide plans "shall include" coverage for "health services of a catastrophic nature." This case turns on the scope of the undefined statutory term "catastrophic."

OPM may also contract with employee organization plans (open only to federal employees who join the organizations that sponsor the plans), and comprehensive medical plans (group-practice plans). FEHBA does not require these plans to include catastrophic coverage. It provides, however, that benefits under all FEHBA contracts shall be subject to "such maximums, limitations [and] exclusions . . . as the Office considers necessary or desirable."[7]

### B. *History of Blue Cross-Blue Shield Contracts*

From FEHBA's inception in 1960 Blue Cross-Blue Shield has, under contract with

---

ganizations of psychiatrists and psychiatric hospitals.

**2.** Plaintiff-appellants no longer press their own and their former coplaintiffs' earlier claims that OPM's decision violated a substantive provision of the Rehabilitation Act, 29 U.S.C. § 794, that OPM arbitrarily and capriciously failed to consider policies expressed in that Act, and that OPM's approval of the 1982 contract violated the equal protection command implicit in the Fifth Amendment.

**3.** Joint Appendix (J.A.) 405.

**4.** 5 U.S.C. § 8905(e); 5 C.F.R. § 890.301.

**5.** 5 U.S.C. § 8906.

**6.** 5 U.S.C. § 8903.

**7.** 5 U.S.C. § 8902(d). *See also id.* § 8902(e) ("[OPM] may prescribe reasonable minimum standards for [all FEHBA] health benefits plans . . . .").

OPM, offered the one government-wide service benefit plan; Aetna Life Insurance Company ("Aetna") has offered the government-wide indemnity benefit plan.[8]

The 1960 Blue Cross-Blue Shield contract provided full coverage for 30 days per year of hospitalization for mental illness and 80% coverage for additional inpatient days;[9] for outpatient treatment of mental illness the plan provided 50% coverage of an unlimited number of visits.[10] In 1964 inpatient coverage of treatment for mental illness was increased from 30 days per year to 120 days per confinement;[11] in 1965, to 365 days per confinement.[12] Benefits for outpatient mental care were increased from 50% to 80% of all medically necessary visits in 1967.[13] From 1967 until 1975 Blue Cross-Blue Shield offered essentially the same levels of coverage for treatment of mental and physical illnesses.[14]

For the 1975 contract year OPM rejected most of Blue Cross-Blue Shield's requests for significant reductions in both inpatient and outpatient mental health benefits.[15] These requests were renewed. For 1981 OPM agreed to a reduction in the rate of coverage for outpatient mental care from 80% to 70% for all medically necessary visits;[16] OPM rejected Blue Cross-Blue Shield's proposal to limit inpatient mental care to 60 days of coverage.[17] After extensive negotiations addressing diverse interests, described in relevant detail below, OPM agreed to a 1982 Blue Cross-Blue Shield contract that reduced inpatient mental coverage from 365 to 60 days, and outpatient mental coverage from 70% of all

---

**8.** The coverage descriptions that follow are based on information supplied in the record and briefs. In some cases, the information so furnished was incomplete or inconsistent. We believe the descriptions here are generally accurate, but recognize that further details or qualifications would refine the picture.

**9.** J.A. 423. For physical illness, Blue Cross-Blue Shield's contract covered 120 days per hospital admission and 80% of the remaining inpatient days. J.A. 26, 29.

As required by FEHBA, both the service benefit and the indemnity benefit plans offer "high" and "low" options to subscribers. The figures reported here are for the high options, but are representative of the trends in mental coverage, and the differences between mental and physical coverage, under both options. For simplicity, we date coverage changes announced in November by the following calendar year.

**10.** For physical illness, Blue Cross-Blue Shield's outpatient coverage was set at 80% of all medically necessary visits. J.A. 16–38.

Aetna's 1960 coverage of mental illness was roughly equivalent to Blue Cross-Blue Shield's. J.A. 426. In 1962, however, Aetna placed a $250 annual maximum on reimbursements for outpatient mental treatment. *Id.*

**11.** J.A. 45, 423.

**12.** J.A. 65, 423.

From 1965 to the present, Blue Cross-Blue Shield's coverage for inpatient treatment of physical illness has been 365 days per confinement. *See, e.g.,* J.A. 65. A limited copayment requirement was, however, imposed in 1982. *See infra,* p. 1324 & note 25.

**13.** Aetna increased its outpatient mental coverage in 1968 to 80% of outpatient services. J.A. 426.

**14.** Opening Brief of Appellants at 6–7.

**15.** J.A. 400. OPM did agree to a $50,000 lifetime maximum on reimbursements for outpatient mental care in Blue Cross-Blue Shield's contract. *Id.;* J.A. 425. *See also Hearings on Premium Rate Increases and Level of Services for the Federal Employees' Health Benefits Program, Before the Subcomm. on Retirement and Employee Benefits of the H.Comm. on Post Office and Civil Service,* 94th Cong., 1st Sess. (1975).

For the 1975 contract year Aetna, with OPM's acquiescence, reduced its mental coverage for outpatient visits to 80% of a maximum of 20 visits per year. J.A. 400, 427. In 1978, Aetna placed a $20,000 maximum on inpatient hospital costs for mental illness, with 20% coinsurance by the patient, and imposed a $1000 per year limit on reimbursements for outpatient treatment of mental illness. *Id.*

**16.** J.A. 425. Blue Cross-Blue Shield had proposed a reduction to 50%. J.A. 408. Congress held hearings in June 1981 that addressed the Blue Cross-Blue Shield cutbacks. *Federal Employee Health Benefits Program: Hearings Before the Subcomm. on Compensation and Employee Benefits of the H.Comm. on Post Office and Civil Service,* 97th Cong., 1st Sess. (1981). J.A. 948.

**17.** Opening Brief of Appellants at 7.

medically necessary office visits to 70% of a maximum of 50 visits.[18]

### C. History of Proceedings

Plaintiff-appellants promptly challenged OPM's decision to accept Blue Cross-Blue Shield's 1982 reductions in mental health coverage. On December 23, 1981, the district court denied plaintiff-appellants' request for a preliminary injunction directing OPM to renegotiate its contract with Blue Cross-Blue Shield so as to reinstate the level of mental health benefits offered in the 1981 plan.[19] This court heard an expedited appeal and affirmed on February 23, 1982. The panel agreed with the district court that, *"in light of the drastic changes in the status quo"* sought in this action, plaintiff-appellants had not demonstrated a likelihood of success on the merits sufficient to justify preliminary relief; the panel further stated its impression that plaintiff-appellants' strongest claim lay in their charge that OPM acted arbitrarily and capriciously in approving, without adequate explanation, the coverage reductions in the Blue Cross-Blue Shield plan.[20] The panel therefore remanded the case to the district court with instructions to OPM to provide a more complete account of its reasons for approving the 1982 contract.

OPM's main initiative on remand was to file the affidavit of Kevin J. Burns, OPM's Assistant Director for Insurance Programs, Compensation Group. The Burns affidavit, J.A. 1081–90, recites the following history of the 1982 contract negotiations between OPM and Blue Cross-Blue Shield.

*March 30, 1981:* Burns initiated the negotiations in a letter to Blue Cross-Blue Shield and other carriers. The letter stated, in part: OPM's "objective for 1982 is to hold premiums and costs as low as possible." Burns affidavit, ¶ 2. Blue Cross-Blue Shield responded with proposed new coverage provisions and premiums.

*August 21, 1981:* OPM analyzed Blue Cross-Blue Shield's proposed rates; the Agency concluded that federal budget limits on the government's FEHBA subsidy required lower rates than those proposed by Blue Cross-Blue Shield. Accordingly, on August 21, OPM suggested three major coverage changes expected to achieve about a 6% reduction in costs. These would have decreased "first dollar" coverage (by increasing deductibles and coinsurance requirements) but would have left largely intact the plan's "last dollar" coverage. Burns affidavit, ¶¶ 3 & 4.

*September 21, 1981:* OPM invited carriers to submit, by September 25, proposals embodying benefit reductions "equivalent," in terms of costs saved, to OPM's August proposals.[21] Burns affidavit, ¶ 5. Further negotiations between OPM and Blue Cross-Blue Shield ensued.[22] Blue Cross-Blue Shield proposed reducing its mental health coverage by imposing a 50-visit limit for

---

**18.** The $50,000 lifetime maximum reimbursement for outpatient treatment set in 1975, *see supra* note 15, was not changed.

Blue Cross-Blue Shield retained 365-day coverage for inpatient treatment of physical illness but imposed a 10-day copayment requirement, *see infra* p. 1324 & note 25, and a 50-visit limit on outpatient treatment of physical illness. Opening Brief of Appellants at 9 n. 10.

Some across-the-board reductions in "first dollar" coverage of treatment for both physical and mental illnesses were implemented. The deductible for all "supplemental benefits" was increased from $100 to $200. Most outpatient care was placed under the category of "supplemental" benefits, rather than "basic," thus imposing a minimum of 20% coinsurance conditions on these benefits. J.A. 409–12. Copayment of $20 per day for the first 10 days of hospitalization, both for physical and mental

treatment, was required. Brief of Blue Cross-Blue Shield at 27.

**19.** *Doe v. Devine,* Nos. 81–2878 & 81–2927 (D.D.C. Dec. 23, 1981).

**20.** *Doe v. Devine,* Nos. 81–2378 & 81–2400 at 2 (D.C.Cir. Feb. 23, 1982) (emphasis in original).

**21.** J.A. 411; Brief of Blue Cross-Blue Shield at 23–24.

**22.** The parties discussed eliminating dental benefits, imposing coinsurance requirements on basic hospital benefits, and reducing mental health benefits. Blue Cross-Blue Shield rejected the first two options as likely to lead to substantial losses of "good risk" subscribers. Supplemental Appendix to Brief of Blue Cross-Blue Shield (Supp.App.) 2; J.A. 492–93.

outpatients and a 60-day limit on inpatient benefits. This fiscally "equivalent" proposal was tentatively accepted by OPM. Burns affidavit, ¶ 8.[23]

Blue Cross-Blue Shield and OPM subsequently considered the possibility of retaining 365-day mental coverage but requiring 30% coinsurance by subscribers. This alternative would have provided the needed cost savings; it was rejected, however, because the coinsurance feature was likely to be less attractive than the Blue Cross-Blue Shield proposal to a substantial majority of federal employees. Burns affidavit, ¶ 14; Brief of Blue Cross-Blue Shield at 26–27.

*October 21, 1981:* In early September, OPM studied the "serious budgetary problems in the health benefits program." Burns affidavit, ¶ 6. In a document dated September 11, 1981, OPM acknowledged that savings beyond those in OPM's August proposals would be required to meet the cost limit set by the federal budget. On October 21, OPM advised carriers that it would be necessary to achieve a further 6.5% reduction in premiums. Burns affidavit, ¶¶ 7 & 8.[24] OPM announced to carriers that benefits should nevertheless be maintained at "acceptable" levels, and that coverage reductions should be made so that no plan or group of individuals would suffer disproportionately. Burns affidavit, ¶ 6. OPM "made it clear that [it would consider]

only limited further reductions, if any, in mental health benefits." Burns affidavit, ¶ 8.

OPM and Blue Cross-Blue Shield ultimately agreed to reduce dental benefits, and to impose a $20 per day copayment requirement on the first 10 days of hospital benefits [25] and a 50-visit limit on coverage of outpatient visits for physical treatment.[26] After some tumultuous intervening litigation [27] the agreed-upon benefit reductions went into effect on January 1, 1982.

In addition to supplying this history, the Burns affidavit explains OPM's main objectives and concerns in its 1982 negotiations with Blue Cross-Blue Shield.

(1) The "vast majority" of mental inpatients are hospitalized for less than 60 days, and the average outpatient requires fewer than 50 visits per year. These facts were "[s]ignificant to OPM's decision to accept [Blue Cross-Blue Shield's] 1982 levels of nervous and mental health coverage." Burns affidavit, ¶¶ 10 & 11.

(2) Throughout the negotiations OPM "was aware of the high cost of insurance for nervous and mental benefits, especially when compared with the limited return for most federal employees." Burns affidavit, ¶ 11.

(3) A "further consideration" for OPM was that the 1982 Blue Cross-Blue Shield

---

**23.** *See also* Brief of Blue Cross-Blue Shield at 24–25.

**24.** *See also* Brief for OPM at 5; Supp.App. at 3–4.

**25.** *Id.;* Opening Brief of Appellants at 8 n. 9, 9 n. 10 (plaintiff-appellants state that the copayment requirement was $25 per day).

**26.** Supp.App. 3–4; *see also supra* note 18.

**27.** Blue Cross-Blue Shield initially concluded that the proposed coverage reductions were so severe that they might lead to wholesale abandonment of Blue Cross-Blue Shield's program by good-risk federal employees. Blue Cross-Blue Shield therefore considered withdrawing entirely from the FEHBA program. J.A. 498–99. On October 29, 1981, Blue Cross-Blue Shield advised OPM that it would terminate the service benefit plan if an open season were held at the normal time. The following day OPM

agreed that Blue Cross-Blue Shield would be allowed to terminate if OPM were unable to postpone the open season, and Blue Cross-Blue Shield agreed to the negotiated cutbacks in coverage. OPM then announced a postponement of the 1982 open season. This decision was challenged and upheld by this court. *National Federation of Fed. Employees v. Devine,* 671 F.2d 607 (D.C.Cir.1982) [hereafter *NFFE II*].

In February 1982 Blue Cross-Blue Shield entered into a settlement agreement in *Doe v. Blue Cross Ass'n & Blue Shield Ass'n,* 545 F.Supp. 576 (D.D.C.1982) (J.A.924), providing that service benefit plan subscribers who were hospitalized for mental illness at the end of 1981 would continue to receive treatment under the 1981 benefit provision.

OPM scheduled and held an open season in May 1982. J.A. 965–66.

mental package was "at least comparable and generally superior to such benefits provided by major private sector employers . . . ." Burns affidavit, ¶ 12.[28]

(4) The package accepted by OPM insured that "claims paid by Blue Cross[-Blue Shield] for nervous and mental benefits would be roughly equal to the premiums paid for those benefits. The same is true with respect to the ratio of claims paid and premiums received for physical coverage. . . . [The result is] a fairer and more accurate allocation of premium payments to coverage offered." Burns affidavit, ¶ 13.

(5) As between the two alternative proposals for cutbacks in inpatient mental coverage—imposing 30% coinsurance with 365-day coverage, or providing full insurance for 60 days but nothing thereafter—OPM rejected the former because it would "negatively affect far more employees." Burns affidavit, ¶ 14.

(6) OPM was mindful of Blue Cross-Blue Shield's concern with the problem of "adverse selection." If an insurer operating in competition with other insurers offers a costly type of coverage that few subscribers want, only high risk subscribers likely to benefit from that coverage will rationally choose that insurer. At best this will cut into the insurer's revenue; at worst, that insurance plan will collapse.[29] "The 1982 contract with Blue Cross[-Blue Shield], with its benefits reductions, was structured to avoid, to the extent possible, the loss of subscribers who are good risks." Burns affidavit, ¶ 15.

On April 30, 1982, the district court, ruling on cross-motions for summary judgment, dismissed the case. It held that the Burns affidavit explained, "in sufficient detail, the various considerations underlying OPM's decision to accept [Blue Cross-Blue Shield's] proposal. Those considerations included all the policy goals which are discernible in the FEHBA, including those embodied in section 8904." District Court Opinion, *supra*, 545 F.Supp. at 584. Plaintiffs then brought this appeal.

The cornerstone of plaintiff-appellants' appeal is their claim that FEHBA requires OPM to negotiate contracts that provide broad coverage of catastrophic mental and physical illnesses. Accordingly, plaintiff-appellants argue, OPM's agreement to reductions in catastrophic coverage for mental illness was arbitrary and capricious if feasible alternative methods could have been devised to achieve OPM's legitimate contract objectives. Plaintiff-appellants attack the justifications for OPM's decisions set forth in the Burns affidavit as either irrational or inconsistent with the goals of FEHBA, with one notable exception; adverse selection, plaintiff-appellants concede, was a legitimate concern of OPM's. Plaintiff-appellants insist, however, that OPM could have protected Blue Cross-Blue Shield from undue adverse selection through alternative measures that would have entailed no significant reductions in catastrophic mental coverage in the carrier's contract: At least Aetna (the other government-wide carrier) and perhaps all carriers could have been required to provide catastrophic mental health protection at approximately the level set in the Blue Cross-Blue Shield Service Benefit Plan.

## II. Discussion

### A. Standard of Review

■ Our review[30] of OPM's proffered justifications for the proposals made, alter-

---

28. *But see infra* note 47 (plaintiff-appellants question the accuracy of this statement).

29. The uncertain dynamics of "adverse selection" under a system in which large numbers of subscribers are free to opt into or out of a plan during a period when the insurer cannot change the terms of its contract or screen new subscribers have been a source of great concern to Blue Cross-Blue Shield. Blue Cross-Blue Shield's fear is that modest adverse selec-

tion can abruptly degenerate into a stampede, with many good-risk subscribers opting out of its plan, and many bad risks opting in. *See* Brief of Blue Cross-Blue Shield at 17–22; 27–30.

30. OPM argues, initially, that its decision to accept a contract with lower levels of mental health benefits is not judicially reviewable. Brief for OPM at 12–15. "There is no statutory standard against which to evaluate the correct-

natives considered, and trade-offs accepted in negotiations with Blue Cross-Blue Shield is guided by the nature of the function Congress assigned to the Agency.[31] Plaintiff-appellants challenge the most informal of informal agency action—the negotiation of a contract. Negotiation involves give and take that does not easily lend itself to the accumulation of a detailed record, to studied, advance justifications of each step taken, or to open, clearly-ordered procedures. These incidents of reasoned decisionmaking are mandatory in formal agency proceedings, and their adoption in informal agency action certainly facilitates judicial review. But an agency's negotiation of a contract cannot be characterized as "arbitrary and capricious" merely because it is fluid, uncertain, and, to a large extent, ad hoc. Courts reviewing a contract negotiation must be mindful of the considerable leeway an agency has in that setting to balance and accommodate competing interests. The agency's judgment must be respected if consistent with the governing law and not unreasonable.[32]

■ A court reviewing an agency's negotiation of a contract, however, properly may demand (1) a coherent, even if post-hoc, statement of the agency's bargaining objectives and concerns, that the court may compare against the objectives prescribed by law, and (2) an adequate account of the bargaining history, that allows the court to determine whether the agency reasonably pressed its own objectives and did not unreasonably accommodate those of the other party to the negotiation.

## B. *FEHBA's Objectives*

■ The first step in our review of OPM's 1982 contract negotiations with Blue Cross-Blue Shield is to identify the objectives that the Act requires or permits OPM to advance in contract negotiations with insurers. The relevant sections of FEHBA, we find, articulate at least four competing goals.

---

ness of OPM's determination of the amount or method by which to approve a reduction in the level of mental health benefits, and, hence 'there is no law to apply.'" *Id.* at 13 (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971)). We disagree.

FEHBA section 8904 states that government-wide contracts "shall include" coverage for "catastrophic" illnesses. That requirement is a specific mandate, not modified by section 8902(d)'s provision that benefit packages are subject to "such maximums, limitations [and] exclusions ... as [OPM] considers necessary or desirable." "Catastrophic" is not defined in the Act, but the requirement that government-wide plans include catastrophic coverage is nevertheless "law," capable of judicial construction consistent with FEHBA's goals, structure, and legislative history. *Cf. National Treasury Employees Union v. Campbell,* 589 F.2d 669, 677–78 (D.C.Cir.1978) (FEHBA section 8902(i)'s requirement that rates "reasonably and equitably reflect the cost of the benefits provided" articulates a standard sufficient to allow judicial review); *American Federation of Government Employees v. Campbell,* No. 80–2751 (D.D.C. Nov. 26, 1980) (reviewing OPM's decision not to accept AFGE's proposed FEHBA contract), *aff'd sub nom. AFGE v. Devine,* 672 F.2d 892 (D.C.Cir.1981); *American Federation of Government Employees v. Devine,* 525 F.Supp. 250 (D.D.C.1981) (disapproving OPM's decision to reject FEHBA plans that provide coverage for abortion). Moreover, we note that the question of reviewability was briefed by OPM, and the Agency's position was tacitly rejected by this court, in our review of the denial of plaintiff-appellants' request for preliminary relief. *Doe v. Devine,* Nos. 81–2378 & 81–2400 (D.C.Cir. Feb. 23, 1982).

**31.** *Cf. National Federation of Federal Employees v. Devine,* 679 F.2d 907, 912 (D.C.Cir.1981) [hereafter *NFFE I*] ("OPM has been granted by statute broad discretionary authority to negotiate and contract for the benefits to be offered by health carriers"); *National Treasury Employees Union v. Campbell, supra,* 589 F.2d at 678 (the scope of review of FEHBA contract negotiations is "quite narrow"); *American Federation of Government Employees v. Campbell, supra,* Memorandum Order at 5 (A "limited" review is "applied to government procurement decisions.... [By analogy,] OPM's decision should be sustained unless it has 'no rational basis' ...." (citation omitted)).

**32.** *Cf. Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973) ("[Challengers of an award of a government contract] bear a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." (footnotes omitted)).

*1. Catastrophic coverage.*—FEHBA unambiguously states that government-wide contracts "shall include" "catastrophic" coverage. 5 U.S.C. § 8904.[33] One major goal of the Act is thus to "protect federal employees against the high and unpredictable costs of medical care." *NFFE I, supra,* 679 F.2d at 913 n. 9, quoting *American Federation of Government Employees v. Devine,* 525 F.Supp. 250, 252 (D.D.C.1981). FEHBA, however, supplies no definition of "catastrophic." And while the legislative history emphasizes, in general terms, the importance of catastrophic coverage in FEHBA contracts,[34] it gives little guidance as to the level of catastrophic benefits section 8904 contemplates in the government-wide plans. It does, however, suggest first, that Congress was prepared to accept significant limits on catastrophic coverage, and second, that Congress did not intend to require equal levels of catastrophic coverage for mental and physical illnesses. These indications substantially weaken plaintiff-appellants' case.

The version of FEHBA that first passed the Senate would have suggested to the Agency minimum levels of catastrophic coverage, with higher minimums for physical than for mental illnesses.[35] The Senate's

**33.** That section provides, in full:

Types of benefits

The benefits to be provided under plans described by section 8903 of this title may be of the following types:

(1) Service Benefit Plan.—
(A) Hospital benefits.
(B) Surgical benefits.
(C) In-hospital medical benefits.
(D) Ambulatory patient benefits.
(E) Supplemental benefits.
(F) Obstetrical benefits.
(2) Indemnity Benefit Plan.—
(A) Hospital care.
(B) Surgical care and treatment.
(C) Medical care and treatment.
(D) Obstetrical benefits.
(E) Prescribed drugs, medicines, and prosthetic devices.
(F) Other medical supplies and services.
(3) Employee Organization Plans.—Benefits of the types named under paragraph (1) or (2) of this section or both.
(4) Comprehensive Medical Plans.—Benefits of the types named under paragraph (1) or (2) of this section or both.
All plans contracted for under paragraphs (1) and (2) of this section shall include benefits both for costs associated with care in a general hospital and for other health services of a catastrophic nature.

5 U.S.C. § 8904.

**34.** *See, e.g.,* S.Rep. No. 468, 86th Cong., 1st Sess. 9–13 (1959); H.R.Rep. No. 957, 86th Cong., 1st Sess. 1–2 (1959), U.S.Code Cong. & Admin.News 1959, p. 2913. In connection with FEHBA's passage, Congressman Rees remarked: "[T]he greatest need lies in the area of protection against the cost of extended or 'catastrophic' illness or injury. . . . [FEHBA] makes this extremely important protection available to Federal employees, along with the more generally prevalent basic coverage, at a cost within their means." 105 Cong.Rec. 17,554 (1959). Congressman Broyhill stated: "Under [FEH-

BA] Federal employees could receive not only generous basic health benefits but also major medical expense benefits. Hospital care, surgery, and limited care for tuberculosis and nervous or mental conditions would be included . . . ." *Id.* at 17,556. Congressman Davis remarked: "Th[e] extended illness with the accompanying terrific expense, without some form of catastrophic sickness insurance, can hardly be borne financially by . . . Government employees . . . . [FEHBA] will provide this much needed protection . . . ." *Id.* Congressman Fulton stated that FEHBA "should cover the major part of hospitalization, medical, and surgical expenses. It should also make some substantial provision for those long illnesses which may entirely deplete a person's savings and then leave him with a huge debt." *Id.* at 17,562.

**35.** The Senate's FEHBA bill provided, in pertinent part,

5(a) To the extent possible with the funds available under this Act, the benefits to be provided under [all FEHBA] plans . . . shall be the following:

(1) Service Benefit Plan.—

(A) Hospital Benefits.—Benefits which the Commission finds to be equivalent to the full cost of hospital care in semiprivate accommodations in a general or acute special hospital for one hundred and twenty days, . . . except that such continuous or aggregate periods in the case of tuberculosis and nervous and mental conditions shall be thirty days. . . .

(E) Supplemental Benefits.—Benefits equal to (i) 80 per centum of so much of the additional charges for health services for each individual for each illness as exceeds $100 but does not exceed $1,500, plus (ii) the amount of any such additional charges in excess of $1,500 under such conditions and such maximums as may be determined appropriate by the Commission. . . .

guidelines relating to minimum levels of coverage were rejected by the House, which preferred to confide even broader discretion in OPM.[36] The Agency has, over the two decades of FEHBA's existence, negotiated and accepted contracts that place definite limits on the "catastrophic" protection afforded subscribers, and that provide more limited coverage for mental than for physical illness. *See supra*, pp. 1321–1323 & notes 9–18. Congress has reviewed OPM's administration of the Act frequently, devoting, on several occasions, special attention to the insurance of mental illnesses, and has taken no action to correct OPM's view of what the Act permits.[37]

*2. Other coverage and low cost.*—While FEHBA makes explicit the goal of providing catastrophic coverage to subscribers, the Act and its legislative history attach importance to other subscriber interests as well.[38] Catastrophic coverage is required only as part of a broader FEHBA objective—to afford federal employees the best possible health coverage at the lowest possible cost to themselves. Congress expected, for example, that FEHBA contracts would offer subscribers broad "first dollar" coverage as well as catastrophic coverage,[39] and the legislative history contains numerous references to the importance of modest premiums affordable to all federal employees.[40] Catastrophic coverage, first dollar coverage, and low premiums are FEHBA goals that vie for attention. OPM cannot negotiate coverage that is complete, from "first" dol-

---

(b) The description contained in subsection (a) of the scope and value of the benefits to be provided ... shall not be construed to preclude the provision of alternative benefits under such plans ... which [the Commission] determines to be equally acceptable under this Act ....

§ 5, S. 2162, 86th Cong., 1st Sess. (1959), *reprinted at* 105 Cong.Rec. 13,559–60 (1959). The Senate bill did not use the term "catastrophic."

**36.** The House replaced section 5(a), (b) of S. 2162 with the language now incorporated in 5 U.S.C. § 8904(a). *See* 105 Cong.Rec. 17,550 (1959). The modification was intended, according to Congressman Murray, to "permit[ ] the Civil Service Commission more latitude in working out a health program which is adequate." *Id.* at 17,553. Congressman Corbett remarked: "Unlike the bill enacted by the other body, this bill does not attempt to spell out all the specific benefits. In both bills the benefits which will ultimately be provided were left largely to the discretion of the Civil Service Commission which is charged with the responsibility of administering the program. This bill gives the Commission even more flexibility in negotiating with the carriers for the best benefit bargain it can arrange." *Id.* at 17,558.

The Senate accepted the change in the same spirit. According to Senator Carlson, the changes would "merely serve to fix responsibility more clearly on the Civil Service Commission as the agency which will have responsibility for administration of the health benefits program." *Id.* at 18,937.

**37.** *See, e.g., Hearings, supra* note 16; *Hearings, supra* note 15, at 5; *Utilization of Mental Health Benefits under the Federal Employees' Program: Hearings Before the Subcomm. on Retirement and Employee Benefits of the*

*H.Comm. on Post Office and Civil Service*, 93d Cong., 2d Sess. (1974).

The 1974 House Hearings, *supra* note 15, at 28, addressed Aetna's significant reduction in its 1975 coverage of catastrophic mental illness. Congress took no action in response to Aetna's cutback.

**38.** *Cf. NFFE I, supra*, 679 F.2d at 912; District Court Opinion, *supra*, 545 F.Supp. at 580; H.R. Rep. No. 957, *supra* note 34, at 4.

**39.** *See, e.g.*, S.Rep. No. 468, *supra* note 34, at 8 ("[A]rrangements whereby Blue Cross members may enter hospitals without an advance deposit ... seem[ ] desirable for low-income employees."); H.R.Rep. No. 957, *supra* note 34, at 2, U.S.Code Cong. & Admin.News 1959, p. 2914 (FEHBA ensures " 'major medical' protection against the expense of catastrophic illness or injury—and, in addition, provides protection for basic health needs."). On the House floor Congressman Murray described the bill as intended to provide benefits "which will include both basic hospitalization and medical services and extended, or 'catastrophic illness,' coverage." 105 Cong.Rec. 17,552 (1959).

**40.** Congressman Rees remarked that coverage would be "at a cost within [employees'] means," *id.* at 17,554; Congressman Broyhill characterized affordability as the "outstanding merit of the bill," *id.* at 17,556; Congressman Corbett stated that OPM should aim "not only to get the best benefits possible but also to assure itself that the premiums payable under the contracts are reasonable and equitable and that they are competitive with premiums charged other large employers for similar insurance," *id.* at 17,558.

lar to "last," without abandoning low cost as an objective.

*3. Low cost to the government.*—The federal government pays about sixty percent of the cost of FEHBA insurance. FEHBA's "entire legislative scheme is based upon OPM considering cost to the government in contracting for health benefit plans.... Congress ... indicated that OPM should be restricted in the health benefit plans it may contract for by the available sums appropriated therefor." *NFFE I, supra,* 679 F.2d at 912.[41] In short, OPM must attend to limits imposed by the federal budget when it negotiates FEHBA contracts.

*4. Interests of insurers.*—While FEHBA is not a program to promote the welfare of the insurance industry, for practical reasons the Act and its history require OPM to consider insurers' interests in the overall calculus. First, FEHBA section 8903 strongly invites OPM to negotiate two government-wide contracts. Implicit in this is the suggestion that OPM should not demand, in the government-wide contracts, terms so generous to subscribers that no insurer will accept them.[42] Second, OPM has an implied responsibility to preserve competition among FEHBA contractors.[43] Congress expected the two, more-closely regulated, government-wide plans to set typical standards of coverage[44] and levels of premiums,[45] but relied on competition among all insurers to keep FEHBA program costs down.[46] Accordingly, as this court has recognized before, OPM appropriately considers in the course of negotiations the "financial stability of the federal employee health benefit program" in general

**41.** *Cf.* H.R.Rep. No. 957, *supra* note 34, at 4 (FEHBA's goal is to ensure maximum health benefits for employees "at the lowest possible cost to themselves and to the Government.").

**42.** FEHBA specifies in section 8904 that the government-wide plans "shall include" catastrophic coverage, but provides in section 8903 only that OPM "may" contract for such plans. Conceivably, these two conditions could be read to require OPM to prefer no government-wide plan at all to one that includes less than complete catastrophic coverage. But the legislative history unambiguously indicates otherwise. Congress firmly intended that two government-wide contracts be negotiated; with that as given, OPM was to negotiate for the best overall bargain it could accomplish—good catastrophic coverage, first dollar coverage, and favorable premiums. Almost every member of Congress who commented on FEHBA assumed that two government-wide plans would be offered. *See generally* 105 Cong.Rec. 13,558–70, 17,549–63 (1959). At least one Congressman read FEHBA to "require" OPM to negotiate such contracts, *id.* at 17,558; several assumed that the government-wide service benefit plan would be negotiated with Blue Cross-Blue Shield, *see, e.g., id.* at 17,552, 17,556. *Cf.* District Court Opinion, *supra,* 545 F.Supp. at 583. ("[I]t was not irrational for OPM to secure [Blue Cross-Blue Shield's] continued participation in the FEHB program by alleviating [Blue Cross-Blue Shield's] uncertainties [with respect to problems of adverse selection].").

Above all, FEHBA contemplates hard-headed but realistic negotiation between OPM and private insurers. Intelligent negotiation demands sensitivity and, on occasion, concession to the objectives of one's partner in negotiation. *See* R. Fischer & W. Ury, Getting to Yes 58–83 (1981).

**43.** Plaintiff-appellants repeatedly acknowledge that a distinctive feature of FEHBA is its design as a system in which insurers "compete vigorously for employees' subscription dollars." Opening Brief of Appellants at 2, 16, 24, 26.

**44.** *See* section 8904, quoted in full *supra* note 33. That section proposes types of coverage for the two government-wide plans, and then suggests that other plans be patterned after the government-wide ones.

**45.** FEHBA section 8902(i) provides: "Rates under [the government-wide plans] shall be determined on a basis which, in the judgment of [OPM], is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers." That section also requires that rates for all plans "reasonably and equitably reflect the cost of the benefits provided."

**46.** "[C]ompetition among carriers and plans [is] healthy and should tend to produce lower costs than if only one approach using one carrier or syndicate of carriers were used to cover all employees." S.Rep. No. 468, *supra* note 34, at 8. Congressman Broyhill stated that under FEHBA "[t]he individual employee would be able to choose between several health insurance plans, a factor I am sure we all consider important." 105 Cong.Rec. at 17,556. Numerous other members of Congress also extolled the virtues of a competitive system.

and, when circumstances so warrant, of one insurer in particular. *NFFE II, supra,* 671 F.2d at 611.

This goal, as much as any other, may compete significantly with section 8904's directive that the government-wide insurers include "catastrophic" coverage. Section 8904 is certainly undercut if OPM demands too little of the government-wide insurers. But if the Agency demands too much, the affected carriers may withdraw from the system or succumb to the less regulated competition, nullifying OPM's leverage on catastrophic coverage when it might merely have been curtailed.

Thus, while OPM is obliged to negotiate for broad catastrophic coverage in the government-wide FEHBA contracts, the Agency may, indeed *must,* simultaneously concern itself with at least three [47] other competing interests: (1) offering federal employees other types of coverage (particularly "first dollar" coverage) and low cost insurance; (2) limiting the federal government's outlays in connection with the FEHBA program; and (3) preserving participation by one insurer in each of the government-wide programs, and by other insurers offering other types of plans, to maintain a competitive system.

## C. OPM's Objectives in the 1982 Contract Negotiations

We next inquire whether OPM's objectives and concerns in negotiating the 1982 Blue Cross-Blue Shield contract were consistent with FEHBA's. The Burns affidavit sufficiently indicates that they were.

First, OPM did have as one objective preserving more than minimal levels of catastrophic coverage in the 1982 Blue Cross-Blue Shield contract.[48] That contract curtails, but does not eliminate coverage for expensive, extended illness. Indeed, the coverage of *both* catastrophic physical and catastrophic mental illness in the 1982 contract substantially exceeds the minimum level guidelines the Senate was prepared to codify when FEHBA was enacted.[49] We reject plaintiff-appellants' contentions that FEHBA section 8904 requires "full" [50] coverage of all catastrophic illnesses, or that it mandates "full 'last dollar' protection," [51] or that it calls for equal coverage of all types of catastrophic illness. The first two suggestions find no support in the Act or its legislative history, and take no account of FEHBA's competing interest in providing first dollar coverage while minimizing cost to subscribers and the government.[52] The third is equally unsupported by the Act, and is undercut by the Senate's original, explicit

---

**47.** Comparability with private sector plans was a further, specifically stated concern. *Compare NFFE I, supra,* 679 F.2d at 913 n. 9, quoting *American Federation of Government Employees v. Devine,* 525 F.Supp. 250, 252 (D.D.C.1981) (one FEHBA goal is to ensure "that federal employee health benefits are equivalent to those available in the private sector so that the federal government can compete in the recruitment and retention of competent personnel"), and similar remarks by Congressman Murray, 105 Cong.Rec. 17,552 (1959), and Senators Clark and Randolph, *id.* at 13,563–64, *with* Burns affidavit, ¶ 12 ("[a] further consideration in OPM's decision to accept the Blue Cross[-]Blue Shield's 1982 level of nervous and mental health benefits, was that these benefits were at least comparable and generally superior to such benefits provided by major private sector employers ..."). The factual premise of this Burns affidavit claim was contested by plaintiff-appellants, however, and Burns's representation in this regard was not relied upon by the district court. Opening Brief of Appellants at 13 n. 13.

**48.** *See supra* pp. 1324–1325.

**49.** The 1982 contract provides for 365 days of coverage for inpatient treatment of physical illness; 60 days for mental illness. The Senate's 1959 proposals were 120 and 30 days, respectively. *See supra* note 35. Outpatient treatment in the 1982 contract is set at 80% coverage for a maximum of 50 visits per year for treatment of physical illness, 70% coverage for up to 50 visits for treatment of mental illness. The 1959 Senate suggested 80% coverage of all outpatient treatment with a $1,500 cap on recovery. *Id.*

**50.** Opening Brief of Appellants at 16.

**51.** *Id.* at 26.

**52.** We note that Blue Cross-Blue Shield's contract has never covered skilled nursing home care or hospice care for the terminally ill. *See, e.g.,* J.A. 181; Brief of Blue Cross-Blue Shield at 10.

proposal, and the House's implied understanding, see supra notes 35–36, that OPM could contract for different levels of coverage for different types of catastrophic illness.

Second, OPM sought to negotiate a contract that would continue to provide other types of coverage, including "first dollar" coverage, and would do so at a reasonable cost to subscribers. OPM announced, at the beginning, its objective "to hold premiums and costs as low as possible." Burns affidavit, ¶ 2. When it considered a choice between two proposals for cutting back mental health coverage that would probably yield the savings budgetary constraints required,[53] OPM opted for the alternative that would preserve better first dollar coverage and negatively affect fewer employees. Burns affidavit, ¶ 14.

Third, OPM's paramount objective was to arrive at a contract that would cost the government no more than had been appropriated for FEHBA subsidy. Burns affidavit, ¶¶ 6 & 7. As to this goal, OPM was inflexible; plaintiff-appellants do not question the budgetary constraint on OPM's bargaining.

Fourth, OPM sought to keep Blue Cross-Blue Shield in the program and thereby preserve the government-wide service benefit plan. Blue Cross-Blue Shield's central concern—a concern that almost precipitated its withdrawal from FEHBA—was with adverse selection. OPM concedes that it shared that concern. Burns affidavit, ¶ 15.

Plaintiff-appellants raise multiple objections to the justifications of OPM's actions supplied in the Burns affidavit. We summarize here the principal points they urge. Plaintiff-appellants object first to OPM's recognizing that a "majority" of mentally ill subscribers will remain well protected under the reduced coverage (Burns affidavit, ¶¶ 10 & 11), and insist that catastrophic coverage must be geared to protecting the minority who will be exposed to large, unin-

sured costs. Opening Brief of Appellants at 33–34. The premise of this argument—that OPM must focus on the provision of catastrophic coverage to the exclusion or substantial subordination of other subscriber interests—is incorrect.[54] FEHBA intended subscribers to receive, at modest cost, broad first dollar as well as last dollar coverage. In attempting to further this objective for as many subscribers as possible, it was proper for OPM to consider what fraction of subscribers would continue to receive full reimbursement under a proposed contract.

In a similar vein, plaintiff-appellants maintain that FEHBA contemplates and requires some degree of adverse selection when it authorizes an arrangement under which two, regulated, government-wide insurers are to compete with other, less regulated carriers. Id. at 40. While plaintiff-appellants concede that the problem of adverse selection is of legitimate concern to OPM, they insist that cuts in catastrophic coverage are permitted only as "a last resort, after the exhaustion of alternative remedies." Id. at 16. Again, plaintiff-appellants' position would require one of FEHBA's goals—insuring federal employees against catastrophic losses—to take clear precedence over others. The Act does not place the goal of providing catastrophic coverage on such an elevated plane that its curtailment is allowed only as a "last resort."

We agree, however, with a third point made by plaintiff-appellants. Under pre-1982 Blue Cross-Blue Shield contracts, subscribers who received mental treatment were reimbursed at rates higher than those at which subscribers who received physical treatment were reimbursed. According to the Burns affidavit, ¶ 13, OPM was sympathetic, during the negotiations, to Blue Cross-Blue Shield's desire to equalize the rates of reimbursement to the two groups of claimants. Plaintiff-appellants question

---

**53.** The first, preferred by OPM, cut to 60 the number of fully reimbursed days of inpatient coverage. The second would have preserved 365 days of coverage, but would have provided

only 70% reimbursement. Burns affidavit, ¶ 14.

**54.** See supra pp. 1326–1330.

the rationality of classifying and comparing the mentally and physically ill in this way. We share their concern.

Blue Cross-Blue Shield contracts are carefully drafted to cover only physician-prescribed or "medically necessary" treatment,[55] whether for physical or for mental illness. That mentally ill claimants receive high rates of reimbursement establishes only that those subscribers suffer from illnesses that require exceptionally costly treatment because of the nature or duration of the affliction. No contract that OPM can negotiate will ever change the fact that those whose medical condition requires more costly treatment will benefit more from their insurance than those whose condition requires less expensive care.

However, the goal of parity between mentally and physically ill claimants was, by all appearances, a minor one for OPM, eclipsed by several others that are both rational and anchored in FEHBA. To survive judicial scrutiny under the deferential standard of review it engages, an agency's negotiation of a contract need not be irreproachable in every detail. It suffices that the agency's objectives be substantially in accord with the statute's, and that the provisions of the final contract advance permitted agency goals. We do not believe that the aim to equalize reimbursement rates to mentally and physically ill claimants so skewed OPM's position that the 1982 contract negotiations with Blue Cross-Blue Shield should be reopened.

### D. OPM's Negotiations with Blue Cross-Blue Shield

We proceed next to determine whether OPM conducted the 1982 negotiations with Blue Cross-Blue Shield in a manner reasonably calculated to further the objectives announced, after the fact, in the Burns affidavit. OPM's description of the negotiations suffices to establish that the Agency engaged in a genuine effort to balance its own conflicting concerns, and to accommodate, within reason, Blue Cross-Blue Shield's competing goals.

OPM first proposed no cutback in catastrophic mental health coverage; after acceding to significant reductions in that area in the September negotiations, the Agency announced, in October, "that only limited further reductions, if any, in mental health benefits would be considered by OPM." Burns affidavit, ¶ 8.[56] OPM's early goal was to increase first dollar coverage of dental care and midwifery;[57] an increase in dental coverage, at least, was apparently abandoned in the October round of cutbacks and, in the end, that benefit was reduced. Brief of Blue Cross-Blue Shield at 27. Confined by the non-negotiable congressional appropriation for 1982's FEHBA subsidy, OPM insisted on the necessary cost reductions, but did so in two cautious stages.[58] Although sensitive to Blue Cross-Blue Shield's concerns about adverse selection, the Agency negotiated a contract which, it appears, came very close to being unacceptable to the insurer.[59] Taking into account the conflicting interests with which OPM contended, we are unavoidably led to the conclusion earlier reached by the district court that "[i]t was not irrational for OPM to accept a[n] ... imposition on one of the FEHBA's purposes, in order to substantially further other, equally valid statutory goals." District Court Opinion, supra, 545 F.Supp. at 582.

We turn, finally, to the specific proposals that plaintiff-appellants suggest OPM should have considered and implemented as

---

**55.** See, e.g., J.A. 176.

**56.** We note in this context that reductions in mental coverage finally approved by OPM for 1982 had been sought repeatedly by Blue Cross-Blue Shield in prior years, see supra p. 1322 & notes 15, 16; thus the Agency did not act in haste in ultimately accepting cutbacks Blue Cross-Blue Shield had long and insistently urged.

**57.** J.A. 606.

**58.** See supra pp. 1323–1324.

**59.** Fears of runaway adverse selection came close to driving Blue Cross-Blue Shield out of FEHBA altogether. NFFE II, supra, 671 F.2d at 611.

alternatives to cutting back on coverage of catastrophic mental illness.

First, plaintiff-appellants point out that OPM could eliminate adverse selection as between Blue Cross-Blue Shield and Aetna by compelling Aetna to offer the same level of mental coverage as Blue Cross-Blue Shield. Opening Brief of Appellants at 46. But this "remedy" risked accelerating flight to the other 120-odd carriers that are not subject to the catastrophic coverage requirement. And since the government's contribution to FEHBA is fixed, plaintiff-appellants' proposal would require a cutback in some other aspect of coverage—most likely first dollar coverage. Read together, the Act and its legislative history do not establish a clear priority binding OPM to trade off first dollar for last dollar coverage. Relevant too, Aetna, although required as Blue Cross-Blue Shield is, to cover "health services of a catastrophic nature," has maintained reduced benefits for mental health since 1975; Congress, aware of Aetna's cutback, has not endeavored to alter Aetna's obligation. *See supra* notes 15 & 37.

Second, plaintiff-appellants suggest that OPM could require all FEHBA carriers to provide the same level of mental coverage as in the 1981 Blue Cross-Blue Shield contract. Opening Brief of Appellants at 46. This alternative would undoubtedly eliminate adverse selection on the basis of the mental coverage offered, but would also move away from FEHBA's two-tiered structure in which only the government-wide carriers are bound by congressional direction to provide "some form of catastrophic sickness insurance."[60] Again, the high cost of coverage for mental benefits would necessitate cuts in other protection desired by subscribers and recognized as important by Congress.[61]

Third, plaintiff-appellants suggest OPM could exercise its general regulatory authority under FEHBA section 8902(d) to set up a "risk pool" to spread the cost of mental coverage among all FEHBA carriers. "Individual carriers would make pro rata contributions to the pool based on their share of total FEHBA subscribers." *Id.* at 47. This proposal is barely distinguishable from the second. A risk pool arrangement would effectively require all carriers to *pay* for mental coverage, and therefore remove incentive not to *offer* it to subscribers.[62]

Plaintiff-appellants' preferred alternatives, in sum, rest upon a view of the statute we have already rejected.[63] They read the FEHBA section 8904 provision for catastrophic protection in government-wide plans[64] to mean protection against all severe or extended illnesses, at very high levels of reimbursement, and as a matter so paramount that reductions in "last dollar" coverage may be made only as a "last resort." We agree that Congress did intend OPM to negotiate firmly with the govern-

---

**60.** *See supra* note 34 (remarks of Congressman Broyhill).

    The "employee organization plans" and "comprehensive medical plans" permitted by FEHBA section 8903(3) and (4) "may" offer any of the types of coverage suggested by FEHBA as appropriate for the government-wide plans, *id.* § 8904(3), (4); these plans "shall include such maximums, limitations, exclusions, and other definitions of benefits as the Office considers necessary or desirable," *id.* § 8902(d). While the latter provision permits significant regulation of these plans, it is unlikely that Congress would have restricted the "catastrophic" coverage requirement to the government-wide carriers if it had intended OPM to require uniform provision by all insurers of the same levels of catastrophic coverage.

**61.** *See supra* pp. 1328–1330.

**62.** We are puzzled by plaintiff-appellants' request that we remand with instructions to OPM to "impose such catastrophic mental health coverage requirements on other FEHBA carriers as it deems necessary and appropriate to protect Blue Cross-Blue Shield from adverse selection." Opening Brief of Appellants at 49. OPM can negotiate, but cannot "impose," contract terms. And apart from Aetna, an appellee in this action, the other carriers are not before the court; no order directly affecting their interests should issue without affording those carriers a chance to present their side of the story.

**63.** *See* pp. 1326–1330.

**64.** The text of section 8904 is set out *supra* note 33.

ment-wide carriers for catastrophic coverage. But it would take far clearer directions than Congress has supplied in section 8904 for a court to hold that OPM does not have considerable latitude to accept reductions in some forms of catastrophic coverage in the interest of arriving at "the best benefit bargain it can arrange." [65] OPM sought to assemble a total package of benefits that reasonably accommodated the diverse concerns and interests of subscribers, the government, and the carrier. It proceeded in a manner we cannot characterize as irrational.

### III. Conclusion

In negotiating the 1982 contract with Blue Cross-Blue Shield OPM set goals that were, by and large, consistent with FEH-

BA's, and conducted its negotiations with the insurer in a manner reasonably calculated to advance those goals. OPM's decision to accept the 1982 contract "reflected a rational balancing of conflicting statutory purposes," District Court Opinion, *supra,* 545 F.Supp. at 584, and therefore withstands judicial review. Accordingly, the judgment from which this appeal has been taken is

 *Affirmed.*

---

**65.** *See supra* note 36.