Joseph D. GARVEY and Frances A. Garvey, husband and wife

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, the National League of Postmasters of the United States, and United States Office of Personnel Management, Compensation Group.

Civ. A. No. 83–0694.

United States District Court, E.D. Pennsylvania.

April 13, 1984.

Jonathan Wheeler, Philadelphia, Pa., for plaintiffs.

Peter C. Paul, Philadelphia, Pa., for defendant Prudential Ins. Co.

Susan Dein Bricklin, Asst. U.S. Atty., Philadelphia, Pa., for defendant U.S. Office of Personnel Mgmt.

Henry S. Ruth, Jr., Michael Olmstead, Philadelphia, Pa., for defendant Nat. League of Postmasters.

MEMORANDUM

O'NEILL, District Judge.

Plaintiffs are Joseph Garvey, a federal employee, and Frances Garvey, his wife.

In November, 1980, Mr. Garvey enrolled in a Health Benefits Plan sponsored by the National League of Postmasters.[1] The contract of insurance consisted of three parts: an agreement entered into by the Office of Personnel Management (OPM) and the Postmasters (the carrier), a group policy issued to Postmasters by the Prudential Insurance Company of America (the underwriter) and a brochure of benefits published and distributed by OPM to beneficiaries of the Plan. It is agreed that the benefits section of the contract is contained in the brochure.

In his health benefits registration form, Mr. Garvey elected high option coverage, which provided, among other things, unlimited benefits for private duty nursing care for himself and his dependents.[2] The Garveys' coverage[3] under the Plan became effective January 1, 1981.

On July 31, 1981, while a patient at Episcopal Hospital, Mrs. Garvey suffered several strokes which left her a quadriplegic. She remained a patient at Episcopal until November 5, 1981, at which time she was transferred to Harrison House, a skilled nursing facility adjacent to Episcopal. She was discharged from Harrison House on February 26, 1982, and thereafter has received round-the-clock private duty nursing care in her home at an estimated cost of $9,000 to $13,000 per month. For the year 1982, this cost was paid or reimbursed by Prudential.

The Postmaster's Plan is one of the 161 health benefit plans made available to federal employees pursuant to the Federal Employees' Health Benefits Act, Title 5 U.S.C. §§ 8901–13 ("FEHBA").[4] The premium is paid in part by the employee and in part by the federal government according to a formula established by the statute, see Title 5 U.S.C. § 8906. The government's contribution is a sum equal to 60% of the average premium for six selected plans.

Each year a contract is negotiated between OPM and each of the carriers of the health benefits plans. The final determination as to coverage is made by OPM, and the benefits to be provided are then defined in this contract. Benefits may be changed each year as a result of the negotiations. Premiums charged by the carriers are based on prior loss experience and the benefits to be provided. Employees are notified of changes in benefits by means of a brochure published annually by OPM for each health benefits plan, see Title 5 U.S.C. § 8907.[5] Each year, during an "open season" after benefit changes and premium rates are announced, federal employees are permitted to switch from one plan to another regardless of the state of their health.

During the 1981 contract negotiations,[6] OPM requested that all plans make significant reductions in their benefits packages because OPM's budget was not sufficient to pay the government's share of the cost of the plans as proposed. OPM negotiated with each plan to secure the requested reductions. Postmasters (the Plan with the "richest" benefits, N.T. II 77),[7] was able to reduce the benefits provided in their 1982 plan without limiting the private duty nursing benefit. As a result, it became the only one of the ten health benefits plans open to

1. Mr. Garvey first enrolled in the Postmasters Plan in 1979, but that enrollment is not material to the issues herein.

2. At the risk of stating the obvious, a private-duty nurse is one assigned to only one patient.

3. Prudential suggests that only the insured member can be a claimant under the Plan and that, therefore, "technically" Mrs. Garvey is not a proper plaintiff. (Prudential Brief, pg. 3). This issue need not be resolved.

4. For "an overview of FEHBA", see Doe v. Devine, 703 F.2d 1319, 1321 (D.C.Cir.1983).

5. For example, the Postmasters brochure for the year commencing January 1, 1981, at page 23 sets forth in large type "How Plan Benefits Change in January 1981" and specifies various benefit increases over the prior year and also a decrease in benefits, the exclusion of charges for treatment of weight control or reduction.

6. See Nat'l Federation of Federal Employees v. Devine, 679 F.2d 907 (D.C.Cir.1981).

7. "N.T. I" refers to testimony at the preliminary hearing; "N.T. II" refers to testimony at the final hearing.

all federal employees which provided unlimited private duty-nursing benefits.[8]

During the 1982 negotiations Postmasters requested permission to reduce the unlimited private-duty nursing benefit for 1983. Reductions in other benefits not relevant to this case were also proposed. The reduction in unlimited private-duty nursing benefits was approved by OPM, which for some years had been concerned about the "rich benefit structure" of the Postmasters Plan and its escalating rates (N.T. II 78). OPM was cognizant of the problems encountered by Postmasters as the only open plan retaining the right to unlimited private-duty nursing benefits. Selection of the plan by all federal employees requiring this expensive care would force the cost of the Postmasters plan to escalate, and would reduce the ability of the plan to compete with other health benefit plans. OPM believed that the reduction in benefits might contain costs, improve reserves and prevent adverse selection. A reduction in unlimited private-duty nursing benefits to a maximum amount of $10,000 per year was disclosed by the 1983 Postmasters Benefits Plan brochure, which was distributed in 1982 to plan enrollees, including plaintiffs.

In early 1983, at the request of OPM, Postmasters agreed to extend unlimited private-duty nursing benefits for one additional year to those enrollees in the Garveys' situation. Counsel for plaintiffs was notified of this agreement by letter dated May 16, 1983. Since the premiums to be paid to the underwriter had been calculated on the basis of the $10,000 maximum, Postmasters, rather than Prudential, paid for the additional cost of providing the benefit to Mrs. Garvey in 1983.

The 1984 benefits package provided by Postmasters includes the $10,000 limitation on private duty nursing care benefits. Thus, during 1984 plaintiffs are entitled to receive benefits for private-duty nursing care, but only up to that maximum amount.[9]

The Complaint, naming Prudential, Postmasters and OPM as defendants, was filed on February 10, 1983. Jurisdiction is based

---

8. Of the more than three million federal employees enrolled in the plans, 75% are in these ten.

9. Plaintiffs have been covered by the Postmasters Plan to the present date. The uncontradicted testimony of Dr. Adler, Mrs. Garvey's treating physician, is that she will continue to require medical treatment for an indefinite period of time and that such care can be provided by an institution such as Harrison House. Dr. Adler described Harrison House as a skilled nursing facility with nurses, monitoring devices, suction equipment and various other kinds of medical facilities for the care of patients "as readily available as [in] acute care facilities" (N.T. I 41). He concluded that Harrison House is "one of the better places in this area for chronic care.... The nursing care is quite good, and they also have a hospital within 100 feet, and various acute problems can be handled in that way." (N.T. I 39).

The following colloquy occurred between the Court and Dr. Adler:

"THE COURT: Where is Harrison House located?

THE WITNESS: It is physically located on the campus of Episcopal Hospital 200 feet away from the hospital building proper.

THE COURT: So that if need develops for acute care or for medical attention, they are quickly available?

THE WITNESS: Yes. It's almost like being in the hospital. They have the same facilities for x-ray and laboratories." (N.T. I 41).

The cost of confinement at an institution such as Harrison House would be borne by the Postmasters Plan so long as medical treatment is necessary and until and unless such confinement is merely for the purpose of custodial care. Plaintiffs assert that that cost would be approximately equal to the present cost of private duty nurses, that is, about $13,000 per month. While this fact is, in the Court's view, irrelevant it should be noted that the only evidence of such cost is Dr. Adler's statement that he had "heard estimates" that the cost of Harrison House was "around $13,000 a month" (N.T. I 40).

Dr. Adler testified that institutionalization of Mrs. Garvey "would be devastating to her mentally" (N.T. 37) and that "she would probably die" if confined to Harrison House (N.T. 38). Dr. Adler did not suggest that Harrison House could not provide adequate care for Mrs. Garvey. So far as the record shows, the only basis for his prediction that Mrs. Garvey would die there is his belief that she would lose her will to live if separated from the environment of her home (N.T. I 37–39).

on Title 28 U.S.C. §§ 1332 and 1346. The jurisdictional provision of FEHBA, Title 5 U.S.C. § 8912[10] was not specifically invoked. The Complaint alleges that the termination of the nursing benefits which plaintiffs were receiving constitutes a breach of contract (Complaint, para. 13 and see N.T. II 3–4). Plaintiffs request that defendants be directed to restore the benefits which existed prior to January 1, 1983, and be permanently enjoined from terminating those benefits. Plaintiffs also seek damages. Defendants deny liability; Prudential and OPM assert that, in any event, they are not subject to suit.[11]

Plaintiffs filed a Motion for a Preliminary Injunction on December 15, 1983. After hearing, the Motion was denied because plaintiffs had failed to demonstrate a likelihood of success on the merits sufficient to justify preliminary relief. After final hearing, without jury, all parties submitted Requests for Findings of Fact and Conclusions of Law and supporting Memoranda.

Plaintiffs advance two theories in support of recovery:

(1) Prior to January 1, 1983, they acquired a contractually vested right to unlimited benefits for private-duty nursing care. Consequently, the subsequently imposed limitation of $10,000 on such benefits (without their consent) constituted a breach of contract;

(2) They are entitled to unlimited benefits for private-duty nursing care by virtue of the catastrophic benefits provisions of their present policy.

## VESTED RIGHTS

FEHBA granted the Civil Service Commission, later the OPM, broad discretionary authority to negotiate, contract for and approve the benefits to be offered by health carriers to federal employees, *Nat'l Feder-*

ation of Federal Employees v. Devine, 679 F.2d 907, 912 (D.C.Cir.1981). Title 5 U.S.C. § 8902(d) provides as follows:

"(d) Each contract under this chapter shall contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions and other definitions of benefits *as the Office considers necessary or desirable.*" (Emphasis supplied).

As "part of OPM's broad discretionary power to approve health plan benefits, [OPM has] the power to order reductions in benefits", *Nat'l Federation of Federal Employees v. Devine, supra,* 679 F.2d at 912, in order "to assemble a total package of benefits that reasonably accommodate[s] the diverse concerns and interests of subscribers, the government, and the carrier." *Doe v. Devine,* 703 F.2d 1319, 1334 (D.C.Cir.1983).[12] In making this accommodation, OPM is required to pursue the objective, among others, of lowest possible cost to the employee-subscribers themselves and to the government; when it negotiates FEHBA contracts OPM must obey the limits imposed upon it by the federal budget, *Doe v. Devine, supra,* 703 F.2d at 1329. Although OPM's decisions in this regard are reviewable, its judgments must be sustained "if consistent with the governing law and not unreasonable," *Doe v. Devine,* 703 F.2d at 1326.

Plaintiffs do not assert that OPM or Postmasters acted arbitrarily or capriciously in reducing the benefits of the Postmasters Plan (Plaintiffs' Brief, pp. 13–14 and see N.T. II 3). What they do assert is that OPM and Postmasters could not, while reducing those benefits prospectively, terminate the benefits already being paid to plaintiffs, *ibid.* No authority directly on point has been cited to the Court and the

---

**10.** "The district courts of the United States have original jurisdiction, concurrent with the United States Claims Court, of a civil action or claim against the United States founded on this chapter."

**11.** In view of the decision reached in this matter, it is not necessary to rule upon the latter defense.

**12.** See 5 U.S.C. § 8902(e).

matter appears to be one of first impression.[13]

Title 5 U.S.C. § 8902(i) and (a) specifically authorizes OPM to make "benefit adjustments" on an annual basis and contains no language prohibiting an adjustment which would adversely affect benefits being received by an insured at the time that the adjustment is made.

On the inside of the front cover of the brochure covering the 1981 Postmasters Plan, in a large box headed "National League of Postmasters of the United States," there appears the following language:

> "This brochure is ... the contract statement of benefits, exclusions, limitations, and definitions. It states the benefits to which an employee and each eligible family member covered by this Plan are entitled....
>
> The contract may be modified or terminated, but no modification or termination will affect adversely any benefit for an allowable expense incurred prior to such modification or termination." [14]

Plaintiffs contend that the second paragraph of the language just quoted is ambiguous. Their argument is as follows:

> "There is an ambiguity in this contractual language. The language can be interpreted to mean that a subsequent modification or termination will not adversely affect the level of benefits already being received under the insurance policy. Conversely, this language can be interpreted to mean that the modification or termination will not adversely affect the payment of any expense incurred prior to the modification or termination of the Plan, but submitted thereafter. Since defendants drafted this policy language, the ambiguity must be interpreted in favor of increased coverage for the policy holder, and this language must be interpreted to mean that the level of benefits for expenses incurred prior to modification or termination will not be affected by the modification or termination." (Plaintiffs' Brief, p. 20).

■ The Court is unable to conclude that the quoted contractual language is ambiguous. There is nothing in the language which remotely suggests that a subsequent modification "will not adversely affect the level of benefits already being received." The words "level of benefits" are not used. What is expressly preserved from the effect of any subsequent modification is "any benefit *for an allowable expense incurred prior to such modification*" (emphasis supplied).[15] The unavoidable consequence of this language is that a previously allowable expense which is made nonallowable by modification will not be reimbursed if it is incurred after the modification. Thus, the contract language precludes any vested right of the Garveys to continue to receive private-duty nursing care without limitation on its cost.

Plaintiffs cite cases decided under the laws of several states to support their contention of a vested right. At the outset it should be observed that since the contractual language negates any such right, state authorities to the contrary would not be controlling. Title 5 U.S.C. § 8902(m)(1) provides:

> "The provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans to the extent that such law or regulation is inconsistent with such contractual provisions."

---

13. Some of the plaintiffs in *Doe v. Devine, supra,* which involved reductions in mental health benefits, were persons similarly situated to the Garveys; however, their claims apparently were settled, 703 F.2d at 1324 n. 27.

14. Identical language appears in the same place in the 1982 and 1983 Postmasters brochures;

similar language appears in all federal employee organization plans (N.T. II 93).

15. Page 5 of the brochure states that "Expenses are incurred on the date services and supplies are received."

However, the conflict contemplated by the statute does not arise because the authorities cited by plaintiffs do not compel a result different from that required by the language of the contract.

The two cases cited by plaintiffs which are most nearly on point are *Danzig v. Dikman,* 78 A.D.2d 303, 434 N.Y.S.2d 217 (1980) and *Myers v. Kitsap Physicians Service,* 78 Wash.2d 286, 474 P.2d 109 (1970).

In *Danzig,* Blue Cross-Blue Shield had issued a group contract to the Queens County Bar Association, of which Danzig was a member. Thereafter he suffered a stroke requiring that he have daily nursing care. Blue Cross provided private-duty nursing benefits pursuant to a contract provision which had no lifetime maximum for such benefits. Thereafter, as a consequence of experience under the contract, Blue Cross proposed a substantial increase in the premium for the new contract year. In order to avoid this increase, the Bar Association and Blue Cross negotiated a modification of the contract which, among other things, imposed a lifetime maximum of $5,000 for private-duty nursing care.

The Appellate Division held that the modification could not deprive Danzig of benefits for continued private-duty nursing care without a maximum amount. There were two grounds for the holding. First, there was no contract provision that expressly provided for modification which could deprive Danzig of a vested right under the contract without his consent, 434 N.Y.S.2d at 219, 220.[16] Second, the contract was ambiguous and could reasonably be read as requiring Blue Cross to continue nursing benefits: the earlier contract specifically stated that there was no lifetime maximum for private-duty nursing care, thus evidencing an awareness of the parties that the need for such care could continue for life and thus beyond any single contract year, 434 N.Y.S.2d at 218, 220–21.

The contract language in *Danzig* was materially different from that in the present case. Here, there is an unambiguous contract provision permitting the modification complained of.

In *Myers,* plaintiff became a member of defendant health care service contractor. Thereafter, he began to suffer from a chronic kidney disorder. He was admitted to an artificial kidney center where he received hospital hemodialysis treatments. His contract with defendant obligated the latter to "furnish during any certificate year all necessary medical, . . . and hospital services . . . for any illness . . ." 474 P.2d at 110. After defendant refused to pay for the hospitalization and treatment on the grounds that they were not covered by the contract, Myers instituted suit in a state court, which rendered summary judgment in his favor. Pursuant to that judgment defendant paid benefits for the remainder of the contract year but modified its basic health contract for the succeeding year to exclude chronic kidney disorder treatments from coverage. Upon refusal of defendant to pay benefits under the later policy, Myers brought a second action, which was dismissed on the grounds that the first contract had a term of one year, that it required defendant to pay only for medical services rendered during that year, and that defendant had an absolute right to modify the contract at the beginning of each succeeding contract year, 474 P.2d at 110.

The Supreme Court of Washington reversed. It held that the contractual language was ambiguous and that the words "life of the contract" could reasonably be interpreted to mean such time as might be required to treat an illness which occurred within the one-year term of the contract. In addition, the Court held that when defendant drafted the contract it may have contemplated the situation in which Myers found himself because it obligated itself to provide services to him during *"any* certificate year"*, 474 P.2d at 111 (emphasis by the Court).

**16.** In fact, the contract contained no provision authorizing modification but only a provision permitting termination, from which, the Court held, the power to modify could be inferred.

As in *Danzig*, the contract language in *Myers* is materially different from that in the present case. In each of those cases, the Court recognized that plaintiff's rights were governed by contract. In each case, the Court held that the contractual language was ambiguous; that it was reasonably capable of an interpretation which favored plaintiff; and, thus, that it was to be construed against the insurer, which drafted the policy. That is not the case here. The contractual language is clear and the Court is required to give it its plain meaning, *Houghton v. Amer. Guar. Life Ins. Co.*, 692 F.2d 289, 291 (3d Cir.1982).[17]

### CATASTROPHIC COVERAGE

On page 20 of the 1983 brochure, which is also the official description of benefits for 1984, the following appears:

"SUPPLEMENTAL BENEFITS

HIGH OPTION

After YOU PAY the first $200 (The Deductible) PLAN PAYS 80% of the eligible expenses incurred by a person in a calendar year, subject to the Catastrophic Protection provision.

\*   \*   \*   \*   \*   \*

PRIVATE DUTY NURSING CARE BENEFIT

Benefits for private duty nursing care by a professional registered nurse (R.N.), licensed practical nurse (L.P.N.), or a licensed vocational nurse (L.V.N.) are limited to a maximum of $10,000 per person per calendar year.

CATASTROPHIC PROTECTION

Under the High Option, if, in a calendar year, the out-of-pocket expenses for coinsured eligible expenses exceed $1,000 for a person under Self Only ($2,000 per family under Self and Family), the Plan will pay 100% of the eligible expenses incurred during the remainder of that calendar year.

Expenses incurred for the treatment of mental, psychoneurotic and personality disorders are not included under the Catastrophic Protection Benefit."

Plaintiffs assert that the last three paragraphs, when read together, create an ambiguity as to whether the $10,000 limitation for private-duty nursing care is superseded by the catastrophic protection provision as soon as the $2,000 coinsurance amount has been paid by the employee. They argue that, given the ambiguity, a proper interpretation of the language results in an obligation of defendants to pay the unlimited cost of private duty nurses once the $2,000 threshold has been met.

Here again, the Court finds no ambiguity in the language of the contract. On page 21, "Supplemental Benefits (Continued)", under the heading "What Is Covered", it is stated:

"Subject to the definitions, exclusions and limitations in this brochure, this Plan will pay Supplemental Benefits, as shown on page 20, for charges ... for the following medical necessary services....

Special nurses—services of a professional registered nurse (R.N.), licensed

---

**17.** Plaintiffs assert that the present policy is an "occurrence" policy, that the happening of Mrs. Garvey's illness was a contingency insured against, and that once the contingency occurred the Garveys became entitled to a continuation of benefits so long as the illness lasts. This assertion seems to be merely a different way of expressing plaintiffs' vested right theory; in any event, the simple answer to the assertion is that the contract does not so provide.

Plaintiffs also emphasize that at the time of enrollment Mr. Garvey contemplated that health benefits for a serious medical condition could and would continue from one policy period into the next. Since the contract cannot reasonably be so read, his contemplation, if a fact, is irrelevant.

Finally, plaintiffs offered as an expert witness on the subject of group health insurance Roseanna Coleman, Director of the Group Insurance Department of the Employee Benefits Division of a diversified financial services firm. The Court reserved its ruling on defendants' objections to this testimony but now holds it inadmissible because Ms. Coleman admittedly had no knowledge or experience with federal employee benefit plans under FEHBA. If admissible, the Court gives no weight to her testimony that the contractual provisions herein involved "might" be ambiguous to an average person reading them (N.T. II 56–57). No factual basis was stated for her surmise and it is noteworthy that she herself found the provisions unambiguous and understood them to have the meaning for which defendants contend (N.T. II 56–57, 58).

practical nurse (L.P.N.), or licensed vocational nurse (L.V.N.)".

"Catastrophic Protection" is a "Supplemental Benefit ... shown on page 20." All such benefits are expressly subject to the "limitations in this brochure." The limitation in the brochure for private duty nursing care is clearly specified on page 20 as "a maximum of $10,000 per person per calendar year." The Catastrophic Protection provision is subject to that limitation. Accordingly, there is no merit to plaintiffs' contention.[18]

The Court is not unmindful of the understandable desire of plaintiffs to have Mrs. Garvey remain in her home. Their rights, however, are dependent on a contract whose meaning is clear and the Court may not torture its language to create an ambiguity where none exists, *Houghton v. Amer. Guar. Life Ins. Co., supra*, 692 F.2d at 291.

The foregoing shall serve as the findings of fact and conclusions of law required by Rule 52(a), F.R.C.P. Judgment will be entered in favor of defendants and against plaintiffs.

---

**18.** It is a settled principle of contract construction that "Where there is a repugnancy between general clauses and specific ones, the latter will govern," 4 *Williston on Contracts* § 619, p. 743 (3d ed. 1961); *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973). This principle need not be invoked, however, because there is no "repugnancy" between the two provisions discussed above.