Berris BLAKE, Plaintiff,

v.

H–2A AND H–2B VOLUNTARY EM-
PLOYEES' BENEFICIARY ASSO-
CIATION, et al., Defendants.

No. 3:95CV00399(WWE).

United States District Court,
D. Connecticut.

Jan. 10, 1997.

---

Kenneth I. Friedman of Beck & Eldergill, Manchester, CT, for plaintiff.

Eric M. Gross of Green & Gross, P.C., Bridgeport, CT and Morris Kletzkin of Friedlander, Misler, Friedlander, Sloan & Herz, Washington, DC, for defendants.

### Ruling on Defendants' Motion for Summary Judgment

EGINTON, Senior District Judge.

This tragic case involves a challenge by plaintiff, now a quadriplegic as a result of a serious automobile accident, to the actions of defendants in amending an employee welfare benefit plan to provide a lifetime cap on medical benefits of $150,000, which did not exist at the time of plaintiff's accident. Plaintiff claims that the actions of defendants violate the antidiscrimination provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, and constitute a breach of the fiduciary duties owed to plaintiff as a plan participant under 29 U.S.C. §§ 1104, 1109, as well as under the terms of the plan and summary plan description.

Pending before the Court is Defendants' Motion for Summary Judgment (Document # 17). Although plaintiff's case is emotionally compelling, this Court holds, for the reasons set forth below, that defendants are entitled to summary judgment as a matter of law.

### I. Facts

Plaintiff Berris Blake is a citizen of Jamaica. During June of 1994, plaintiff was a temporary worker in the United States under the Temporary Foreign Workers Labor Program (the "H–2A Program"). *See* 8 U.S.C.A. § 1101(a)(15)(H)(ii)(a) (West 1996 Supp.). He was employed as a tree farm worker by Cappachione Farms in Preston, Connecticut.[1] On June 18, 1994, plaintiff was severely injured in an automobile accident in Connecticut, as a result of which he was rendered a quadriplegic. He was hospitalized at the William Backus Hospital in Norwich, Connecticut, for two and one-half

---

1. The I–9 Form completed by plaintiff and his employer shows New Apple Council, Inc., of Shelburne, Massachusetts, as his employer. The exact identity of his employer is unimportant to this motion for summary judgment. It is important to note only that plaintiff was not employed by either of the defendants.

months and later received rehabilitative care at Fairlawn Rehabilitation Hospital for approximately one year. In July of 1995, he returned to Jamaica for further rehabilitation.

By virtue of his H–2A worker status, plaintiff was able to participate in the H–2A and H–2B Voluntary Employees' Beneficiary Association Health and Welfare Plan ("the Plan"), a welfare benefit plan governed by ERISA. The Plan was adopted on December 31, 1992, by defendant H–2A and H–2B Voluntary Employees' Beneficiary Association as its Sponsor to benefit H–2A and H–2B workers who are sponsored by participating Caribbean countries to work in the United States. Trustees of the Plan are Vincent Morrison, who resides in Kingston, Jamaica, and Anthony Irons, who is also the Permanent Secretary–Ministry of Labour, in Jamaica.

The Plan is administered by defendant West Indies Central Labour Organisation ("WICLO"), an unincorporated organization established by the governments of the Caribbean participating countries to monitor the welfare of their workers while they are in the United States.[2] The Plan provides life, accidental death and dismemberment benefits; accident and sickness benefits; hospital benefits, surgical expense benefits, medical expense benefits and drug and medicine bene-

fits for members of the H–2A and H–2B Voluntary Employees' Beneficial Association who elect coverage. (Section 1.3 of the Plan).

Since the commencement of the Plan, every eligible H–2A and H–2B worker has elected to be covered by the Plan, including plaintiff. To receive coverage each participant must make a weekly contribution of $4.80.

Prior to and at the time of plaintiff's accident, the Plan did not have a cap on the dollar amount of medical coverage which it would provide to Plan participants.[3] The Plan did, however, limit the payment of hospital, surgical, medical, and drug and medicine benefits to those expenses incurred during a thirteen-week period of disability. (Sections 8.4, 9.4, 10.4, and 11.3 of the Plan). Furthermore, any benefits under the Plan would terminate upon a participant's leaving the United States. The Plan also provided for continuation coverage if elected by a participant, which plaintiff through his attorney elected.[4] (Section 16.1 of the Plan).

On September 22, 1994, the Plan was amended by the Trustees, Mr. Morrison and Mr. Irons, to provide a cap of $150,000 on the amount of all medical benefits that could be paid over the lifetime of any one individual.[5]

---

**2.** Defendants describe WICLO as an unincorporated association that is the administrative arm of the Caribbean Regional Labour Board, whose members are the Caribbean nations of Jamaica, Barbados, St. Vincent, St. Lucia, Grenada, Belize, Trinidad, Tobago, and Dominica. Each of these nations has contributed workers to the Temporary Foreign Workers Labor Program, the H–2A Program. The workers are monitored by WICLO while in the United States.

**3.** Exhibit I of the Plan is the "Schedule of Maximum Benefits." For "Hospital Expense Benefits, Surgical Expense Benefits, Medical Expense Benefits and Drug and Medicine Expense Benefit[s]", the only maximum was "Reasonable and Customary Medically Necessary actual expense incurred by the Member."

**4.** On September 30, 1994, plaintiff's attorney notified the Plan that plaintiff elected continuation benefits and enclosed a check for the pre-payment of the next fifteen months of continuation benefits.

**5.** The Amendments to the Plan provided in relevant part as follows:

The Trustees of the H–2A And H–2B Voluntary Employees' Beneficiary Association Health and Welfare Plan ("Plan") hereby amend the Plan to impose a lifetime cap on benefits. These amendments generally are effective October 1, 1994. For purposes of determining the total benefits paid to a Member, however, benefits paid before and after October 1, 1994 are counted.

1. A new Section 4.4 is added to read as follows:

"*Section 4.4 Lifetime Maximum Benefit Limit.* Notwithstanding any other provision of this Plan, no more than $150,000 of benefits shall be paid to any Member. This limit applies to the aggregate amount of benefits paid under the plan (it does not apply on a benefit by benefit basis). For example, if a Member receives $50,000 in hospital and surgical expense benefits, $50,000 in medical expense benefits, and $50,000 of drug and medicine expense benefits, no additional benefits of any kind will be paid to that Member."

Additionally, each section dealing with Life Benefits, Accidental Death and Dismemberment Benefits, Hospital Benefits, Surgical Expense Bene-

The amendment was effective October 1, 1994, and applied to medical expenses incurred after September 30, 1994. In determining whether the cap had been reached, however, the amendment provided that benefits paid both before and after September 30, 1994, were to be taken into account. *See* Note 5, *supra.* Furthermore, the cap applied to all types of Plan benefits in the aggregate, such that for example hospital and surgical expense benefits, medical expense benefits, and drug and medicine expense benefits would be added together to determine whether the cap had been reached. *Id.* Additionally, the amendment applied to every Plan participant irrespective of illness.

The Plan was amended pursuant to Section 15.1 of the Plan which provides in relevant part:

> *Section 15.1 Amendment.* This Agreement may be amended at any time and from time to time by a written instrument signed by the Trustees.... The instrument of amendment shall specify its effective date and amendments may be made effective retroactively. This Agreement also may be terminated at any time by the Trustees.

As a result of his accident, plaintiff incurred medical bills of $191,134 as of September 30, 1994, which were paid by the Plan. However, plaintiff has incurred substantial additional medical bills of $206,105.94,[6] which defendants have refused to pay, citing the $150,000 lifetime cap on benefits which plaintiff had already exceeded as of September 30, 1994.

These facts are not disputed. In dispute, however, are the facts relating to defendants' motivation in adopting the cap and whether defendants attempted to force plaintiff to return to Jamaica so as to deprive him of Plan benefits.

Defendants claim that their motivation in adopting a lifetime benefits cap was purely financial and was in no way designed to penalize plaintiff. While this Court has no difficulty in accepting defendants' assertion that their motivation was financial, more problematic is their motivation vis-a-vis the plaintiff. Defendants assert that the idea for amending the Plan was conceived prior to plaintiff's accident and arose out of a concern for the financial condition of the Plan. They assert that the Plan was losing money and the only two options available were to increase the workers' contributions,[7] which they chose not to do, or to establish a benefits cap. They admit, however, that plaintiff was the first Plan participant to have medical bills in excess of $150,000. Given that fact, it is difficult to understand how the Trustees would have contemplated prior to plaintiff's accident, that enacting a $150,000 benefits cap would improve the financial condition of the Plan. At that point in time, it would have had no effect.

Moreover, Noel P. Heron, the Chief Liaison Officer for WICLO, the Administrator of the Plan, admitted in his deposition that plaintiff's accident was a precipitating force in rushing the passage of the amendment. He further admitted that, when he contacted the Plan's attorneys to discuss implementing the cap, he discussed with them the subject of plaintiff. He testified that the $150,000 figure was based on his research relating to the cost of three months of hospitalization for a serious injury. (It is not clear whether his $150,000 figure also included doctors' bills and other medical bills that would not be included in the hospital bill). He stated that the three-month baseline that he employed correlated with the thirteen-week period un-

---

fits, Medical Expense Benefits, and Drug and Medicine Expense Benefits was amended to incorporate this lifetime maximum benefit limit of Section 4.4. Exhibit I, Schedule of Maximum Benefits, was also amended with the addition of the following sentence: "In accordance with Plan Section 4.4, no more than $150,000 of total benefits shall be paid to any Member."

**6.** Although the Summary of Unpaid Bills does not indicate whether all of the outstanding bills are for services rendered after September 30, 1994, this appears to be the case based on the briefs submitted by the parties. Moreover, plaintiff does not contend that defendants have refused to pay any bills that were incurred prior to the effective date of the amendment.

**7.** At the time the amendment was passed, each Member was paying a weekly contribution of $4.80.

der the Plan during which benefits were payable to an injured or sick member.

Plaintiff contends, however, that not only was his accident the precipitating event for the Trustees' amending the Plan, but that the cap was based upon his medical bills of which defendants were keenly aware—not on Mr. Heron's analysis of three months of hospitalization costs.

In opposition to the motion for summary judgment, plaintiff has filed excerpts from the deposition of Joan Orowson, the Patients Account Manager at the hospital where plaintiff was treated. From these excerpts, it is abundantly clear that defendants were very concerned about plaintiff's escalating hospital bills, as well as plaintiff's return to Jamaica. Despite the repeated visits of the WICLO liaison officers to the hospital, the hospital was not aware that plaintiff had medical coverage through the Plan until early August of 1994 when the hospital finally got in touch with the Plan Administrator with the help of plaintiff's attorney. The hospital accounts records indicate that Mr. Heron was less than forthcoming about any available coverage. At one point he refused to indicate whether plaintiff was covered by the Plan; at another time he refused to provide information regarding the amount of coverage; and yet at another time he advised the account representative that there was very limited funding available and that there was no way they could cover a charge of $103,718, which was the outstanding hospital bill at that time.[8] Eventually plaintiff's attorney supplied the hospital with necessary documentation. Ultimately, representatives of WICLO contacted the hospital to request a discount of 20% to 30% on the bill, and the hospital did in fact grant the Plan a 20% allowance on the hospital's bill of $142,712.50. There are also several notations in the hospital accounts records of representatives of defendants inquiring as to why plaintiff had not yet been sent back to Jamaica.

Plaintiff further alleges that Larkland Stone, a WICLO liaison officer, visited him on at least two occasions in the hospital for the purpose of forcing plaintiff to agree to return to Jamaica for medical treatment. The first of these visits occurred the day after plaintiff's accident when plaintiff was in intensive care. Plaintiff states that he never wanted to return to Jamaica for medical treatment and never did anything to indicate to defendants that he wanted to return. When plaintiff indicated to Mr. Stone that he did not want to return, however, according to plaintiff, Mr. Stone laughed and told plaintiff that he would send him back anyway. Plaintiff also asserts that, without his knowledge or consent, defendants went so far as to contact a physician in Jamaica concerning plaintiff's medical care and made arrangements to have him returned to Jamaica.

Defendants do not dispute that WICLO liaison officers discussed plaintiff's returning to Jamaica with him and admit that they operated on the assumption that he would be returning as soon as he was released from the hospital. Indeed, Mr. Stone admits that he saw plaintiff on at least six occasions while he was hospitalized and admits that he told plaintiff he would be returning to Jamaica for rehabilitation after he was released from the hospital. He claims that, although plaintiff could not speak, plaintiff nodded his head in agreement. When asked in deposition why he wanted to return plaintiff to Jamaica, he responded that this was the "normal" procedure but he admitted that it was not a written procedure. He and Mr. Heron testified that in WICLO's fifty-two years of experience in administering to the needs of its workers, WICLO has always operated on the "well-founded assumption" that its injured workers preferred to receive treatment in their home countries because they recuperate better and more rapidly once they return to their home countries. Mr. Stone further testified that he reported on plaintiff's condition to Mr. Heron, who requested periodic updates on plaintiff's condition and who was

---

8. The Summary Annual Report of the Plan, which plaintiff's attorney supplied to the hospital, showed Plan assets as of September 30, 1993, just nine months after commencement of the Plan, of $248,003. No additional information regarding assets as of August 1994, when these conversations between the hospital and Plan Administrator took place, has been provided.

very concerned about the cost of plaintiff's medical treatment. He also discussed with Mr. Heron plaintiff's return to Jamaica.[9]

Construing all facts and drawing all reasonable inferences in favor of plaintiff as the non-moving party, as this Court is required to do in ruling on a motion for summary judgment, *see Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987), this Court finds that defendants intentionally adopted a cap on medical benefits for the purpose of limiting plaintiff's medical benefits as well as those of others similarly situated in the future. The Court further finds that defendants intentionally sought to induce plaintiff to return to Jamaica for rehabilitation as soon as possible so as to reduce the costs of his medical treatment to the Plan.[10] Having drawn these factual inferences in favor of plaintiff, the Court now turns to the legal issues presented by defendants' motion for summary judgment.

## II.  Discussion

### A.  Plaintiff's Discrimination Claim

■ Plaintiff has alleged that the defendants discriminated against him for exercising his rights to benefits under the Plan and unlawfully interfered with his attainment of rights, in violation of section 510 of ERISA. Section 510 of ERISA, 29 U.S.C.A. § 1140 (West 1985), provides in relevant part as follows:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may be-

come entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.... The provisions of section 1132 of this title shall be applicable to the enforcement of this section.

As recognized by the Second Circuit in *Dister v. Continental Group, Inc.*, 859 F.2d 1108 (2d Cir.1988), "[s]ection 510 was designed *primarily* to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.' *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980)." *Id.* at 1111 (emphasis added). And, in fact, most of the reported decisions under section 510 involve an employer-employee relationship. *Vogel v. Independence Fed. Sav. Bank*, 728 F.Supp. 1210, 1225–26 (D.Md.1990).

Plaintiff in this case, however, seeks to invoke section 510 not to challenge discriminatory conduct of his employer but to challenge actions by a plan sponsor and administrator in amending an ERISA plan. Whether section 510 encompasses this type of claim is an issue that has not been addressed by the Second Circuit.

As recognized by the Fifth Circuit in *Hines v. Massachusetts Mutual Life Ins. Co.*, 43 F.3d 207 (5th Cir.1995), the courts are divided on this issue. At least three circuits have restricted the scope of section 510 to acts that affect the employer-employee relationship; "in other words, plan amendments by themselves cannot be actionable under § 510." *Id.* at 210 n. 5. *See Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan*, 24 F.3d 1491, 1504 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995); *McGath v. Auto–Body North Shore, Inc.*, 7 F.3d 665, 670 (7th Cir.1993); *Rogers v. Jefferson–Pilot Life Insur. Co.*, 883 F.2d 324 (4th Cir.1989) (applying section 510 only to actions against an employer, not against insurers or other third parties administering insurance bene-

---

9. Mr. Heron testified that the cost of medical treatment in Jamaica was approximately one-tenth of the cost of treatment in the United States, and therefore it would cost the Plan less money if Plaintiff returned to Jamaica. While a member's entitlement to benefits would normally cease upon his leaving the United States, because Plaintiff elected continuation coverage, he would still be entitled to coverage for these expenses in Jamaica.

10. For purposes of the motion for summary judgment only, defendants indicate in their Reply Memorandum that they will accept plaintiff's characterization of the events which took place at the hospital.

fits). At least one other circuit court has suggested that a plan could be discriminatorily modified to intentionally benefit or injure certain identified employees or groups of employees. *See Aronson v. Servus Rubber, Div. of Chromalloy,* 730 F.2d 12, 16 (1st Cir.), (although the court found that a termination of benefits that cut along independent lines, *e.g.,* the elimination of a profit-sharing plan at one of two plants, and that had a readily apparent business justification demonstrated no invidious discriminatory intent), *cert. denied,* 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 357 (1984). The court in *Hines* noted this split in the circuits but expressly reserved ruling on the issue, as it had in an earlier case, *McGann v. H & H Music Company,* 946 F.2d 401 (5th Cir.1991), *cert. denied,* 506 U.S. 981, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992).

The district courts have also divided on this issue. In *Vogel v. Independence Fed. Sav. Bank,* 692 F.Supp. 587 (D.Md.1988), an action against an employer, insurance agency and insurer for intentional termination of medical coverage for a particular employee, the court noted that, while section 510 is most commonly applied in cases when an employer terminates an employee to prevent his pension rights from vesting, "the language of the statute cannot be read so as to limit its application solely to those situations.... The statute ... cannot be limited solely to suits against employers.... [T]he Court is satisfied that a claim of wrongful interference with the attainment of medical benefits is sufficient to seek redress under this section." *Id.* at 593. Accordingly, the court denied the defendants' motion to dismiss. *But see Rollo v. Maxicare of Louisiana, Inc.,* 698 F.Supp. 111, 114 (E.D.La.1988) (expressly rejecting the holding in *Vogel* and holding that section 510 was not intended to apply to non-employers).

The *Vogel* and *Rollo* decisions were discussed by the court in *Swanson v. U.A.*

*Local 13 Pension Plan,* 779 F.Supp. 690 (W.D.N.Y.), *aff'd,* 953 F.2d 636 (2d Cir.1991), in addressing the issue of whether a pension plan administrator and the plan itself could be liable under section 510 for persuading the plaintiff to retire without fully advising him of the consequences of his retirement. The court held that the import of *West v. Butler, supra,* relied upon by the Second Circuit in *Dister, supra,* as well as by the court in *Rollo,* was not that section 510 applied only to employers but that it only reached conduct which fundamentally changed the employer-employee relationship so as to interfere with pension rights. 779 F.Supp. at 701. Indeed, the court in *Swanson* read *West* as holding that "persons" other than employers could be liable under section 510 and concurred in that holding since "employers are not the only persons or entities capable of affecting the employment relationship." [11] *Id.* at 702. The court then held that the individual administrators were nevertheless entitled to summary judgment in that their conduct did not amount to the kind of direct interference in the employment relationship that is required to establish liability under section 510. *Id.*

This Court finds the reasoning of *Swanson* persuasive and holds that section 510 may apply to defendants other than employers. The statute by its very terms applies to "persons," which is defined by ERISA. Had Congress intended to limit the applicability of section 510 to "employers," a term also defined by ERISA, 29 U.S.C.A. § 1002(5), it could have done so as it has in other discrimination statutes. *See, e.g.,* 42 U.S.C.A. § 2000e-2(a) (1994); 29 U.S.C.A. § 623 (1985). This Court notes parenthetically that the Summary Plan Description for the Plan in question supports this interpretation. It provides that "[n]o one, including your employer, any union, *or any other person,* may dismiss you or otherwise discriminate against you in any way to prevent you

---

11. The court noted, however, that not every type of entity was a proper defendant under the statute, and held that a pension plan was not a proper defendant. 779 F.Supp. at 701 (citing *Adams v. Koppers Co.,* 684 F.Supp. 399 (W.D.Pa. 1988)). The court reasoned that "ERISA expressly defines the term 'person' as 'an individu-

al, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization.' 29 U.S.C. § 1002(9). Pension plans are conspicuously absent from this list." *Id.*

from obtaining a benefit under the Plan or exercising your rights under ERISA." (Emphasis added). Thus, this Court holds that plaintiff's section 510 claim is not barred solely by virtue of the fact that it does not involve an employer-employee relationship.[12]

■ That determination, however, does not resolve the issue of defendants' liability under section 510. An essential element of plaintiff's proof under section 510 is to show that the defendant was "at least in part motivated by the specific intent to engage in activity prohibited by section 510." *Dister, supra,* 859 F.2d at 1111. As discussed above, construing the facts most favorably to plaintiff, we find that defendants were motivated at least in part by the specific intent to limit plaintiff's medical benefits—both in amending the Plan and in seeking to return plaintiff to Jamaica as quickly as possible. A more difficult question, however, is presented regarding whether this was activity prohibited by section 510.

In *McGann, supra,* relied upon by defendants, the Fifth Circuit considered whether a section 510 claim would lie for alleged discrimination in reducing benefits available under a group medical plan for treatment of acquired immune deficiency syndrome (AIDS) and related illnesses. Just seven months after the plaintiff submitted his first claim for his treatment for AIDS, he was informed by his employer that they had become self-insured and had limited the benefits payable for AIDS-related claims to a lifetime maximum of $5,000, whereas previously the lifetime cap had been $1,000,000. No limitation was placed on any other catastrophic illness. Just as in this case, the plaintiff argued that the provision limiting coverage for AIDS-related expenses was directed specifically at him in retaliation for exercising his rights under the medical plan and for the purpose of interfering with his attainment of a right to which he may become entitled under the plan. In moving for

summary judgment, the defendants admitted that the reduction in AIDS benefits was prompted by knowledge of the plaintiff's illness, and that the plaintiff was the only employee known at the time to have AIDS.

Although the court expressly declined to decide whether section 510 applied to a case where the employee benefit plan was altered in an allegedly discriminatory manner, the court granted the defendants' motion for summary judgment on two other grounds. First, holding that at trial the plaintiff would bear the burden of proving the existence of the defendants' specific discriminatory intent, the court found nothing in the record to suggest that the defendants' motivation was other than as they had stated—namely to avoid the expense of paying for AIDS treatment. That intent, the court found, was directed no more toward the plaintiff than any other present or future participant who might contract AIDS. 946 F.2d at 404.

The same rationale would apply in this case. However, in light of the Second Circuit's holding in *Dister, supra,* that the plaintiff's burden is to show only that the defendant "was at least *in part* motivated by the specific intent" to engage in prohibited activity, this Court declines to go as far as the Fifth Circuit did in holding that the mere fact that the amendment *could apply* to other participants absolves the defendants of liability. The Court does, however, find compelling the other basis for the court's granting summary judgment in *McGann, i.e.* that plaintiff has not, and cannot, prove the existence of a right to which he is entitled under the Plan.

■ Section 510 is entitled "interference with protected rights." It provides that it is "unlawful for any person to ... discriminate against a participant ... for exercising *any right to which he is entitled* under the provisions of an employee benefit plan .. or for the purpose of interfering with the attain-

---

12. Obviously, Plaintiff's employment relationship was terminated as a result of this tragic accident that rendered him totally disabled for the rest of his life. Dr. Tom P. Bell, the attending surgeon for Mr. Blake, wrote in a letter dated September 29, 1994 to the State of Connecticut, Disability Determination Services,

Mr. Blake suffers from a cervical spine fracture with resultant quadriplegia. He is unable to care for himself in any way and is completely dependent on other[s] for all activities. He is obviously disabled medically.... It is clear that his medical and surgical disease are without question totally disabling.

ment of *any right to which such participant may become entitled* under the plan. . . ." 29 U.S.C.A. § 1140 (West 1985) (emphasis added). Thus, for plaintiff to be able to assert a cause of action under section 510, he must establish that he had a right to continued unlimited medical benefits.

The *McGann* court, faced with this issue, held that the plaintiff had failed to adduce evidence of the existence of any right to which he might become entitled under the plan. The "right" to which section 510 refers, the court held, is a "right to which an employee may become entitled pursuant to an existing, enforceable obligation assumed by an employer." 946 F.2d at 405. The court found that there was nothing to indicate that the $1,000,000 coverage limit in that case was permanent. Indeed, the plan expressly provided that it could be terminated or amended at any time. The court held that to adopt the plaintiff's position would mean that an employer could not effectively reserve the right to amend a medical plan to reduce benefits as to subsequently incurred medical expenses. *Id.* Citing the Second Circuit case of *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988), the court held that ERISA does not require the "vesting" of the right to a continued level of the same medical benefits as those that are ever included in a welfare plan. *Id.*

■ The Second Circuit in *Moore* held that automatic vesting does not occur in the case of welfare plans. Where the plan documents clearly reserve the right to amend the plan, an ERISA plan may be amended to change or limit the coverage provided. The Court reasoned:

> With regard to an employer's right to change medical plans, Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans. Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in

the costs of treatment independent of inflation. These unstable variables prevent accurate predictions of future needs and costs. While these plaintiffs [retired employees who were challenging an employer's ability to amend a medical plan based in part on representations outside of the plan documents] would be helped by a decision in their favor, such a ruling would not only fly in the face of ERISA's plain language but would also decrease protection for future employees and retirees.

856 F.2d at 492. *See also Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, ——, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995) (holding that ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits).

Similarly, the Eleventh Circuit in *Owens v. Storehouse, Inc.*, 984 F.2d 394 (11th Cir. 1993), held that "ERISA does not prohibit a company from terminating benefits that are neither vested nor accrued. . . . Unlike pension benefits, welfare benefit plans neither vest nor accrue. *See* 29 U.S.C. § 1051(1)." *Id.* at 397–98 (citations omitted). In so holding, the court rejected the plaintiff-claimant's "latent vesting" argument that employers may not change the terms of their employee insurance programs to affect a particular illness once an employee has contracted that illness and begun making claims for it. The court held that section 510 contains no such requirement. *Id.* at 398.

■ The Plan at issue contained a clear and unambiguous provision allowing the Trustees to amend the Plan and for those amendments to apply retroactively. Under ERISA, as the Second Circuit has made clear, there is no vested right to a continuation of a certain level of medical benefits under a welfare benefits plan. *See also West v. Greyhound Corp.*, 813 F.2d 951, 954 (9th Cir.1987) (holding that there is no language in ERISA which provides for the accrual of welfare benefits or guarantee that such benefits are vested or nonforfeitable). Plaintiff, as a participant in an ERISA welfare benefit plan, possessed no inviolate rights in the terms of the Plan, such as might be true with

respect to vested provisions of a pension plan. As regrettable as plaintiff's situation is, the Trustees had the right to amend the Plan to ensure the continued viability of the Plan. Accordingly, plaintiff cannot carry his burden at trial of proving discrimination with respect to any *"right to which he is entitled* under the provisions of an employee benefit plan" or interfering with "the attainment of any *right to which [he] may become entitled* under the plan." 29 U.S.C.A. § 1140 (emphasis added). On this basis this Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's Section 510 Claim.

### B. Plaintiff's Claim for Defendants' Breach of Fiduciary Duty

In addition to alleging a violation of section 510, plaintiff also claims that defendants breached their fiduciary duties owing to him as a plan participant under the terms of the Plan documents and ERISA. Citing section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), plaintiff alleges that defendants were required to discharge all duties as fiduciaries solely in the interests of the participants and beneficiaries and "for the exclusive purpose of providing benefits to participants and their beneficiaries ... and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA." In addition, plaintiff asserts that the Summary Plan Description required defendants to ensure that the Plan was administered in a manner that was fair to all members, which he alleges they failed to do.

As the Supreme Court held in *Curtiss–Wright Corporation v. Schoonejongen,* 514 U.S. at —, 115 S.Ct. at 1228, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans," citing *Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 947 (6th Cir.1990) (holding that a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan).

In *Musto v. American General Corp.,* 861 F.2d 897, 912 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), the court rejected the plaintiffs-retir-ees' claims against their former employer for breach of its contractual and fiduciary duties by changing the terms of the medical coverage available to them. The court noted that "[t]here is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second." 861 F.2d at 911. *See also Owens v. Storehouse, Inc., supra.*

■ Here, the benefits cap was enacted in compliance with the amendment provisions of the Plan, Section 15.1. Defendants were not acting as fiduciaries in amending the Plan or in deciding what the new terms would be. Plaintiff was put on notice by the Summary Plan Description that the Plan could be amended, which it in fact was. It cannot be said that defendants acted unfairly toward plaintiff or breached any fiduciary duty owing to plaintiff in enacting this amendment. There was no fiduciary duty owing in that regard.

Therefore, this Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's Breach of Fiduciary Claims.

### III. Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED. The Clerk is directed to enter judgment in favor of Defendants on all Counts.

**SO ORDERED.**