Sandra MESSMER, Individually and as Guardian of David G. Messmer, Plaintiff,

v.

XEROX CORPORATION, Preferred Care, Defendants.

No. 99–CV–6199L.

United States District Court, W.D. New York.

March 26, 2001.

Angelo T. Calleri, Rochester, NY, for plaintiff.

Margaret A. Clemens, Nixon Peabody LLP, Rochester, NY, for Xerox Corp., defendant.

Harold Iselin, Couch White Brenner Howard & Feigenbaum LLP, Albany, NY, Leslie F. Couch, Albany, NY, for Preferred Care, defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, Sandra Messmer, individually and as Guardian of her husband David G. Messmer ("Mr. Messmer"), commenced this action by filing a summons in the Office of the Monroe County Clerk on December 30, 1998. Plaintiff filed a complaint in New York State Supreme Court, Monroe County on April 30, 1999. Defendant Xerox Corporation removed the action to this court on May 12, 1999 under 28 U.S.C. § 1331, on the ground that plaintiff's claim was preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

The original complaint asserted a common-law breach of contract claim against Xerox and defendant Preferred Care, arising out of the termination of certain medical benefits that Mr. Messmer had been receiving under a medical insurance plan offered to Xerox employees and their families pursuant to a contract between Xerox and Preferred Care. After the case was removed to this court, plaintiff filed an amended complaint. Defendants have moved for summary judgment dismissing the amended complaint, and plaintiff has cross-moved for summary judgment in her favor.

## BACKGROUND

Plaintiff is, and at all relevant times was, a retired Xerox employee. As such, she was entitled to various benefits, including health care benefits for her and her family. In order to obtain coverage, plaintiff was allowed to select any one of several benefit plans offered by Xerox. These plans were offered pursuant to contracts entered into between Xerox and various health insurance companies and health maintenance organizations ("HMOs"), including Preferred Care. Every year, each insurer would submit a proposed contract for coverage to Xerox for its approval. After approving the contracts, Xerox would then provide its employees with information concerning the benefits under the various contracts, and, during the annual open enrollment period, the employees would individually select whichever plan they wished to subscribe to for the following year.

In 1994, Xerox contracted with Preferred Care for a plan entitled the "Comprehensive Plan." That contract included a rider that expanded the benefit for skilled nursing facility services from 120 days per year (as provided for in the basic contract) to unlimited days of coverage. The rider also informed the subscriber that the benefits would end if, *inter alia,* "your contract is terminated . . . ." *See* Affidavit of John L. Sobraske (attached to Preferred Care's Notice of Motion) Ex. B.

The contract also contained a clause stating that Preferred Care "reserve[d] the right to establish a revised Contract . . . as of each anniversary date of this Contract . . ." on thirty day's prior written notice to the subscriber and the group, if the amendment were approved either by the New York State Superintendent of Insurance, or by the subscriber and the group. The subscriber's acceptance of such a change would be evidenced by the subscriber's choice to continue with the same health plan during the open enrollment period, and by Xerox's continued payment of the premium (including the employee's contribution, if any). *See* Sobraske Aff. Ex. A at V–1.

For 1994, plaintiff chose Preferred Care's Comprehensive Plan for herself and

Mr. Messmer. On October 31, 1994, Mr. Messmer suffered a stroke, and began receiving benefits under the Comprehensive Plan.

In March 1995, Mr. Messmer's physician authorized skilled nursing facility services for Mr. Messmer. Preferred Care paid for these services pursuant to the Comprehensive Plan, which plaintiff had elected to continue for 1995.

In 1997, Preferred Care offered Xerox a new plan for 1998 ("the Community Plan"). This plan differed from the Comprehensive Plan in that, *inter alia,* the subscribers' copayments for medical care were increased, but the premiums were lower. Defendants allege that Preferred Care chose to offer this plan in order to stay competitive with rival HMOs, which had begun offering similar plans to Xerox, and enrollment in Preferred Care's Community Plan had been falling, presumably because most employees preferred plans with lower premiums, notwithstanding the higher copayments.

The Community Plan differed from the Comprehensive Plan in another respect, which lies at the heart of the present dispute. Unlike the Comprehensive Plan (with the rider), the Community Plan provided skilled services only for 120 days per member per year, with a 360-day lifetime cap.

Xerox accepted the Community Plan, and offered that plan instead of the Comprehensive Plan as Preferred Care's plan for 1998. Xerox subsequently provided its employees with a summary of health care options for them for 1998. The notice sent to Xerox employees and retirees during the 1997 open enrollment season stated, "If you are making *no changes,* there is no need to enroll." Sobraske Aff. Ex. M; Affidavit of Sandra Messmer (attached to plaintiff's Notice of Motion) Ex. H. A benefits summary included with the notice expressly set forth the 120/360-day limits on

skilled nursing care under the Community Plan. *See* Sobraske Aff. Ex. M.

Plaintiff made no changes during the open enrollment period. Since she had been a Preferred Care subscriber up to that point, she therefore automatically became covered under the Community Plan effective January 1, 1998.

By letter dated April 6, 1998, Preferred Care notified plaintiff that "effective 01/01/98, [Mr. Messmer's] contract changed [from 365 days per year] to a 120 day Skilled Nursing Home Services Benefit," and that his coverage would be exhausted for that year as of May 1, 1998. Sobraske Aff. Ex. N. This news seems to have come as a surprise to plaintiff, who—despite having been provided with the plan documents advising her that the plans were subject to modification on a yearly basis, and the 1998 benefits summary showing that the Community Plan contained a 120-day annual limit on skilled nursing care—had apparently assumed that as long as she stayed with Preferred Care, she would continue to have unlimited coverage for such care.

Plaintiffs subsequently filed a grievance with Preferred Care over its determination that Mr. Messmer's benefits would cease after May 1. Affidavit of Margaret A. Clemens, Esq. (attached to Xerox's Notice of Motion) Ex. M. Preferred Care's Grievance Committee voted to uphold the denial of benefits. Clemens Aff. Ex. N.

Plaintiff appealed from the Grievance Committee's decision. On that appeal, Preferred Care decided to extend coverage for Mr. Messmer's skilled services to December 31, 1998. Preferred Care alleges that it did so by liberally construing the "continuation of coverage" clause of the contract in effect in 1997, which stated the following:

In the event that coverage terminates for any reason, all benefits will automatically cease on the date of termination.

When this Contract is terminated your coverage will continue for a continuous total disability which began prior to the date of termination. The extension of benefits will continue .only for the condition under treatment and causing total disability at the date of termination until whichever of the following events occurs first:

A. The disability is lifted; ˙

B. The maximum benefit period is reached, or

C. A period of twelve (12) months from the date of termination has elapsed.

Sobraske Aff. Ex. G at 14. Preferred Care alleges that it construed this clause to allow for an extension of benefits for a total disability of twelve months after the termination of the contract, which occurred on December 31, 1997. Preferred Care alleges that afterwards, "for reasons of goodwill," it extended the benefits to February 8, 1999. Mr. Messmer has not received any further benefits for care after that date.

The amended complaint alleges that Preferred Care "wrongfully omitted the Rider" for skilled nursing care from the Community Plan that it offered to Xerox for 1998. Amended Complaint ¶ 12. Plaintiff alleges that Preferred Care did so in order to avoid paying additional benefits to Mr. Messmer. The complaint also alleges that Preferred Care failed to inform Xerox of the omission of the rider, and of the fact that Mr. Messmer was receiving skilled nursing facility benefits. Plaintiff alleges that as a result, she and Mr. Mess-

mer have been forced to incur expenses that should have been paid for by Preferred Care. Plaintiff also alleges that Xerox should have "require[d]" Preferred Care to continue to provide full coverage for skilled care, although it is not clear how Xerox could have done so. Amended Complaint ¶ 17. Plaintiff seeks damages in an amount equal to the sums that have been and will be paid by the Messmers for Mr. Messmer's care at the skilled nursing facility.[1]

## DISCUSSION

˙ Although—as evidenced by the very name of the statute—ERISA is largely concerned with pension and other retirement-related benefits, that statute regulates other types of benefit plans as well, including the health care benefit plans at issue here. Such plans fall within the category of "employee welfare benefits plans" under ERISA. *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" and "welfare plan" as, *inter alia,* "any plan, fund, or program ... established or ... maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, [or] disability ...").

■ While ERISA does regulate welfare plans, however, it does so to a much lesser extent than it regulates employee pension plans. For instance, "welfare plans are expressly exempted from the Act's detailed minimum participation, vesting and benefit-accrual requirements and

---

1. Although the amended complaint does not cite ERISA, plaintiff does not appear to be dispute that this action is governed by ERISA. *See* Plaintiff's Memorandum of Law at 3 ("The Comprehensive Plan ... constitutes a medical benefits plan ... under the Employee Retirement Income Security Act ....") At any rate, it is clear that plaintiff's claims do relate to an employee benefit plan and are preempted by ERISA. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 44, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

are not subject to ERISA's minimum-funding requirements." *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 491 (2d Cir.1988).

In addition, ERISA generally does not prevent employers from modifying or terminating welfare benefit plans, even if the effect is to discontinue a participant's benefits. As the Supreme Court has explained, "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (employer's amendment of plan pursuant to valid amendment procedure, which deprived plaintiffs of health benefits to which they had previously been entitled, did not violate ERISA) (citation omitted).

■ Because employers have such wide latitude with respect to welfare benefit plans, benefits under such plans generally do not "vest," as do pension benefits. " '[T]he general rule' under ERISA is 'that an employee welfare benefit plan is not vested and that an employer has the right to terminate or unilaterally to amend the plan at any time.' " *Joyce v. Curtiss–Wright Corp.,* 171 F.3d 130, 133 (2d Cir. 1999) (clause in summary plan description ("SPD") that explicitly mentioned that company reserved right to end or amend health insurance that it offered, combined with language in summary annual report stating that termination of collective bargaining agreement would result in termination of medical coverage, precluded any viable claim that SPD served to vest retirees' benefits) (quoting *Schonholz v. Long Island Jewish Med. Ctr.,* 87 F.3d 72, 77 (2d Cir.), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996)). *See also American Fed'n of Grain Millers v.*

*International Multifoods Corp.,* 116 F.3d 976, 979 (2d Cir.1997) ("Unlike pension plan benefits, the benefits provided by a welfare plan generally are not vested and an employer can amend or terminate a welfare plan at any time") (citing *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* 520 U.S. 510, 515, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997)); *Doe v. Group Hospitalization & Medical Servs.,* 3 F.3d 80, 84 (4th Cir. 1993) ("[h]ealth care benefits provided in an employee benefit plan are not vested benefits; the employer may modify or withdraw these benefits at any time, provided the changes are made in compliance with ... the terms of the plan"); *West v. Greyhound Corp.,* 813 F.2d 951, 954 (9th Cir.1987) ("There is no language in ERISA which provides for the accrual of welfare benefits or guarantee[s] that such benefits are vested or nonforfeitable").

■ Certainly an employer may *contractually* limit its ability to modify a welfare plan, or bind itself not to discontinue or reduce existing welfare benefits, but ERISA imposes no such obligation. In the absence of such a contractual promise, therefore, welfare benefits simply do not vest. *See American Fed'n of Grain Millers,* 116 F.3d at 982 ("if an employer has not promised vested benefits in a SPD, and the employer expressly reserves the right to terminate the plan in the SPD, benefits promised in the SPD are not vested").

This different treatment of welfare benefits, as compared with pension benefits, reflects several concerns that Congress had when it enacted ERISA. For instance, committees of both the House and Senate, discussing "accrued benefits" (which are generally not forfeitable, *see* 29 U.S.C. § 1053(a)), stated that that term refers to pension or retirement benefits and is not intended to apply to certain

ancillary benefits, such as medical insurance or life insurance, which are sometimes provided for employees in conjunction with a pension plan, and are sometimes provided separately. To require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income.

H.R.Rep. No. 93–807 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4670, 4726; S.Rep. No. 93–383 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4890, 4935.

In *Moore*, the Second Circuit also discussed Congress's reasons for treating welfare benefit plans differently from pension plans:

> [w]ith regard to an employer's right to change medical plans, Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans. Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation. These unstable variables prevent accurate predictions of future needs and costs.

856 F.2d at 492. *See also Owens v. Storehouse, Inc.*, 984 F.2d 394, 397–98 (11th Cir.1993) ("Congress intended employers to be free to create, modify, or terminate the terms and conditions of employee welfare benefit plans as inflation, changes in medical practice and technology, and the costs of treatment dictate").

▮ As stated, employers may modify or terminate welfare plans even when doing so has the effect of cutting off benefits that had previously been paid to one or more plan participants. In other words, an employer may amend a welfare plan not only to prevent participants from beginning to collect a particular benefit in the future, but also to discontinue a benefit that is already being paid.

In *Owens*, 984 F.2d 394, for example, the plaintiff had been diagnosed with AIDS. At the time, his employer's plan provided for up to $1,000,000 in lifetime benefits. Shortly after plaintiff's diagnosis, the insurer notified the employer of its intent to cancel the policy because of a high incidence of AIDS among the employer's plan members. After negotiations, the insurer renewed the policy, but with drastically reduced benefits. Affirming summary judgment for the employer on the plaintiff's claim under ERISA § 510, 29 U.S.C. § 1140, the Eleventh Circuit noted that "ERISA does not prohibit a company from terminating previously offered benefits that are neither vested nor accrued. Unlike pension benefits, welfare benefit plans neither vest nor accrue." *Id.* at 397–98 (citations omitted). The court stated that "while an employer may contractually bind itself to provide fixed medical benefits, [the employer] did not do so here. Instead, it reserved the right to change or terminate the terms of its plan at any time. Absent contractual obligation, employers may decrease or increase benefits." *Id.* at 398 (citation omitted).

The Fifth Circuit reached a similar result in *McGann v. H & H Music Co.*, 946 F.2d 401 (5th Cir.1991), *cert. denied*, 506 U.S. 981, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992). There, too, the plaintiff was diagnosed with AIDS, and a few months later his employer's medical plan was amended to reduce the limitation on lifetime medical benefits payable for AIDS-related claims from $1,000,000 to $5000; the limit for other catastrophic illnesses remained the same. The employer admitted that

the reduction was prompted by its knowledge of the plaintiff's illness. Affirming summary judgment for the employer and the insurer, the court noted that there was no evidence that the defendants ever promised that the $1,000,000 coverage was permanent, and that the plan expressly provided for termination or amendment of the plan at any time. Since the AIDS exclusion would affect all AIDS sufferers equally, the court also found no unlawful discrimination under § 510. The court concluded:

> Congress did not intend that ERISA circumscribe employers' control over the content of benefits plans they offered to their employees. McGann interprets section 510 to prevent an employer from reducing or eliminating coverage for a particular illness in response to the escalating costs of covering an employee suffering from that illness. Such an interpretation would, in effect, change the terms of H & H Music's plan. Instead of making the $1,000,000 limit available for medical expenses on an as-incurred basis only as long as the limit remained in effect, the policy would make the limit permanently available for all medical expenses as they might thereafter be incurred because of a single event, such as the contracting of AIDS. Under McGann's theory, defendants would be effectively proscribed from reducing coverage for AIDS once McGann had contracted that illness and filed claims for AIDS-related expenses. If a federal court could prevent an employer from reducing an employee's coverage limits for AIDS treatment once that employee contracted AIDS, the boundaries of judicial involvement in the creation, alteration or termination of ERISA plans would be sorely tested.

*Id.* at 407–08.

A district court within this circuit has also reached a similar conclusion. In *Blake v. H–2A and H–2B Voluntary Employees' Beneficiary Ass'n,* 952 F.Supp. 927 (D.Conn.1997), the plaintiff had been in an automobile accident that rendered him a quadriplegic. At the time, his employer's medical plan had no limit on the dollar amount of medical coverage that it would pay to plan participants. Three months after the plaintiff's accident, however, the plan trustees amended the plan to provide a lifetime cap of $150,000. Although the plaintiff's medical expenses incurred up to the time that the plan amendment took effect (about $190,000) were paid by the plan, the defendants, citing the cap, denied the plaintiff's claim for coverage of his additional medical bills, which exceeded $200,000.

The plaintiff sued the plan sponsor and the administrator, asserting claims of discrimination under § 510 and breach of fiduciary duty. For purposes of the defendants' motion for summary judgment, the court assumed that the defendants' purpose in amending the plan was to limit plaintiff's medical benefits as well as those of others similarly situated in the future. Nevertheless, the court ruled in favor of the defendants, stating that

> [t]he Plan at issue contained a clear and unambiguous provision allowing the Trustees to amend the Plan and for those amendments to apply retroactively. Under ERISA, as the Second Circuit has made clear, there is no vested right to a continuation of a certain level of medical benefits under a welfare benefits plan. Plaintiff, as a participant in an ERISA welfare benefit plan, possessed no inviolate rights in the terms of the Plan, such as might be true with respect to vested provisions of a pension plan. As regrettable as plaintiff's situation is, the Trustees had the right to amend the Plan to ensure the continued viability of the Plan. Accordingly, plaintiff cannot carry his burden at trial of proving discrimination with respect to

any "right to which he is entitled under the provisions of an employee benefit plan" or interfering with "the attainment of any right to which [he] may become entitled under the plan."

*Id.* at 935–36 (quoting 29 U.S.C. § 1140) (citation omitted).

The court also rejected the plaintiff's fiduciary-duty claim, stating:

> the benefits cap was enacted in compliance with the amendment provisions of the Plan, Section 15.1. Defendants were not acting as fiduciaries in amending the Plan or in deciding what the new terms would be. Plaintiff was put on notice by the Summary Plan Description that the Plan could be amended, which it in fact was. It cannot be said that defendants acted unfairly toward plaintiff or breached any fiduciary duty owing to plaintiff in enacting this amendment. There was no fiduciary duty owing in that regard.

*Id.* at 936.

Although it did not involve the discontinuation of an existing medical benefit, the Second Circuit's decision in *Moore* also illustrates the degree of freedom that employers have to alter the terms of welfare benefit plans. In *Moore*, a group of retired employees of the defendant sued the employer under ERISA after the employer had raised the deductible amount under its medical benefits plan several times. The plaintiffs alleged that the employer should have been barred from amending the plan in that fashion because in the past the employer had represented to its employees that the plan would provide "lifetime" benefits "at no cost" to the employees. Affirming summary judgment for the defendant, the Second Circuit stated that "[a]utomatic vesting does not occur in the case of welfare plans, and Metropolitan clearly reserved in the plan documents and in the SPDs the right to amend or terminate the plans at issue." *Id.* at 491. The court added that "[w]hile these plaintiffs

would be helped by a decision in their favor, such a ruling would not only fly in the face of ERISA's plain language but would also decrease protection for future employees and retirees." *Id.* at 492.

The principles enunciated in these cases require that plaintiff's claims in the instant case must be dismissed as well. Defendants explicitly reserved their right to amend or terminate the plans at issue, and never made any representations that could reasonably have been construed as a promise that the skilled nursing care rider would always be in effect, or that benefits would never be changed or reduced.

The Comprehensive Plan contained clear, unambiguous language advising participants that it was subject to revision on an annual basis. In the words of the plan itself, "PREFERRED CARE reserve[d] the right to establish a revised Contract . . . as of each anniversary date of this Contract . . . ." In addition, a booklet that Xerox distributed to its employees entitled "You and Xerox: Benefits for Salaried Employees," which summarized Xerox's various benefit plans, expressly notified participants that Xerox "reserve[d] the right to terminate or amend" its benefits programs "at any time." Clemens Aff. Ex. J at 154. Likewise, the rider itself informed the subscriber that benefits for skilled nursing care would end if "your contract is terminated . . . ."

Plainly, then, neither Xerox nor Preferred Care obligated itself by contract to continue paying benefits once those benefits had begun to be paid. Rather, defendants reserved the right and authority to change plans, or the terms of the plans, from one year to the next. As the case authority cited above makes clear, ERISA permits them to do precisely that.

In opposition to defendants' motions, plaintiff raises a number of arguments, none of them with merit. First, plaintiff

contends that Preferred Care "targeted" Mr. Messmer, *i.e.*, that it deliberately omitted the more beneficial rider for 1998 because it knew that Messmer was receiving benefits for skilled nursing care, and Preferred Care wanted to stop paying those benefits. Plaintiff has presented no evidence in support of that assertion, however. Moreover, even if that were the case, it is clear that an insurer *can* lawfully amend a medical benefits plan to reduce its costs, even if the insurer is motivated by its awareness that a particular person has been receiving benefits. That is exactly what happened in *Owens*, 984 F.2d 394, and *McGann*, 946 F.2d 401, and in both cases the courts found no ERISA violation.

In support of her position, Messmer relies on *Danzig v. Dikman*, 78 A.D.2d 303, 434 N.Y.S.2d 217 (1st Dep't 1980), which was not an ERISA case. In *Danzig*, an insurance company had issued a group contract to the Queens County Bar Association, of which the plaintiff was a member. The plaintiff suffered a stroke requiring that he have daily nursing care. The insurance company began providing private-duty nursing benefits pursuant to a contract provision which had no lifetime maximum for such benefits. Thereafter, as a consequence of its increasing costs, the insurance company proposed a substantial increase in the premium for the new contract year. In order to avoid this increase, the Bar Association and the insurance company negotiated a modification of the contract which, among other things, imposed a lifetime maximum of $5,000 for private-duty nursing care.

The plaintiff then sued the insurance company and the Bar Association, alleging breach of contract and other common-law claims. On appeal from an order granting summary judgment for the defendants, the Appellate Division held that the modification of the contract could not deprive the plaintiff of benefits for continued private-duty nursing care without a maximum amount. The court based this holding on two grounds. First, there was no contract provision that expressly provided for modification that could deprive the plaintiff of a vested right under the contract without his consent. *Id.* at 308, 434 N.Y.S.2d 217. Second, the court held that the contract was ambiguous and could reasonably be read as requiring the insurance company to continue paying nursing benefits. In reaching that conclusion, the court noted that the earlier contract provided benefits for services "when necessary for and consistent with the treatment of the Subscriber's injury or illness," and that it also provided coverage for "a pre-existing condition," which it defined as "(a) any condition, disease or ailment which existed on the date the Subscriber became covered under this Contract, or (b) any condition, disease or ailment for which the Subscriber received medical or surgical treatment or advice within one year prior to such date, or (c) any complication of any such condition, disease or ailment." *Id.* at 306–07, 434 N.Y.S.2d 217. The court therefore modified the lower court's order to the extent of declaring that the modification creating the $5000 lifetime maximum was ineffective as against the plaintiff with respect to his need for daily nursing care.

Leaving aside the fact that *Danzig* is a state court case dealing only with New York common law and not ERISA, I find it distinguishable from this case in more than one respect. First, in the case at bar, the Comprehensive Plan *did* expressly provide that it could be modified or even terminated. Whereas the insurance contract in *Danzig* made "[n]o reference to the power to modify," 78 A.D.2d at 306, 434 N.Y.S.2d 217, the contract in this case clearly stated that Preferred Care "reserve[d] the right to establish a revised Contract . . . as of each anniversary date of this Contract . . . ." Second, while the court in *Danzig*

spoke in terms of vested rights, as explained above, welfare plan benefits do not become vested absent an express contractual clause providing for vesting. *See American Fed'n of Grain*, 116 F.3d at 979 ("benefits provided by a welfare plan generally are not vested and an employer can amend or terminate a welfare plan at any time"); *Blake*, 952 F.Supp. at 935 ("Under ERISA, as the Second Circuit has made clear, there is no vested right to a continuation of a certain level of medical benefits under a welfare benefits plan"). No such clause exists here. Other courts faced with similar factual situations have likewise found *Danzig* distinguishable for these same reasons. *See Tackitt v. Prudential Ins. Co. of America*, 758 F.2d 1572, 1575 (11th Cir.1985); *Coan v. State Farm Mut. Automobile Ins. Co.*, 911 F.Supp. 81, 86 (E.D.N.Y.1996); *Garvey v. Prudential Ins. Co. of America*, 596 F.Supp. 1119, 1124 (E.D.Pa.1984).

Plaintiff also relies on the continuation-of-coverage provision in Part VII of the contract, noting that if coverage terminates because of termination of eligibility (as described in Part VI of the contract), all benefits will cease except for coverage for an authorized inpatient admission to a hospital or skilled nursing facility.[2] This argument also fails, however. First, I am not persuaded that this provision is even applicable here. The reference to Part VI appears to relate to the statement in Section VI(B)(2) that a member's coverage can be terminated by the Group if "you are no longer eligible for Group coverage." Preferred Care never determined, however, that plaintiff was no longer eligible for

coverage; it simply limited the duration of benefits available to participants who were covered.

Even assuming *arguendo* that this provision could be interpreted as applying to plaintiff and Mr. Messmer, however, plaintiff fails to note that the relevant section also provides that "[t]he extension of benefits will continue only for the condition under treatment and causing total disability at the date of termination until" any one of several events occurs, including: "The maximum benefit period is reached"; or "A period of twelve (12) months from the date of termination has elapsed." Sobraske Aff. Ex. A at VII–1. Mr. Messmer, however, *did* receive an extension of benefits until February 8, 1999, which was over a year after the contract for the 1997 Comprehensive Plan was terminated, and also beyond the expiration of his 360–day lifetime maximum benefit period under the Community Plan. Thus, even if plaintiff were entitled to the benefit of this provision, he received all that it provided for, and he cannot rely on it to seek yet more benefits.

Plaintiff also states that in previous years while the Comprehensive Plan was in effect, Xerox had misrepresented to subscribers that the Comprehensive Plan limited coverage for skilled nursing facility care to 120 days per year, when in fact pursuant to the rider the plan provided unlimited coverage. Plaintiff alleges that Xerox thereby somehow induced her to assume that her policy would always include the rider. The gist of this argument seems to be that because plaintiff knew

---

**2.** Plaintiff appears to rely on versions of the Comprehensive Plan contract that were in effect in 1994 and 1995. Those contracts refer to continued coverage for care at a Skilled Nursing Facility. The contracts that were in effect in 1996 and 1997 referred instead to the extension of benefits "for a continuous total disability which began prior to the date of termination." *See* Sobraske Aff. Ex. A at VII–1, Ex. C at VII–1, Ex. E at 14, and Ex. G at 14. As will be explained, however, those differences are immaterial, because all four versions of the contract limited the continuation of benefits to a period of twelve months.

from actual past practice that Mr. Messmer was receiving unlimited coverage, despite Xerox's misstatement concerning the 120–day limit, she disregarded, or assumed the falsity of, Xerox's later statement that the 1998 Community Plan contained a 120–day cap on such benefits. In other words, because plaintiff knew that Xerox's prior representations in this regard had been erroneous, she assumed that its representations concerning the Community Plan were similarly erroneous.

These allegations also fail to advance plaintiff's claims. For one thing, the record shows that they are not entirely correct. Although it appears that the 1994 benefits summary did state that skilled nursing facility care was limited to 120 days per year, *see* Messmer Aff. Ex. F, the summary for 1997 accurately stated that such care was "covered at 100%, per contract year when approved by HMO." Preferred Care's Reply Memorandum Ex. A.[3] The summary for 1998—when the Community Plan went into effect—also correctly stated that benefits were limited to 120 days per year, and 360 days lifetime. Messmer Aff. Ex. G.

Thus, plaintiff did receive accurate information for both 1997 and 1998, and could have seen from the benefits summaries for those years that Preferred Care's coverage for skilled nursing facility care had been reduced from unlimited coverage in 1997 to 120 days annually and 360 days lifetime beginning in 1998. Certainly that was sufficient to have put plaintiff on notice that there may have been some change in the duration of such coverage, and she could have inquired had she wanted additional information in that regard. Simply because several years earlier Xerox may have inaccurately *under* stated the avail-

ability of such coverage does not give rise to an ERISA claim when plaintiff did receive fully accurate information in later years, including the two years immediately prior to and following the switch from the Comprehensive Plan to the Community Plan. There is no indication that either defendant ever affirmatively misled plaintiff into thinking that the rider could or would never be modified or terminated, and plaintiff could not reasonably have assumed that that was the case merely on the basis of the erroneous statement in the 1994 summary.

I also find no merit at all to plaintiff's allegation that Xerox should have "required" Preferred Care to include the skilled nursing care rider with the 1998 Community Plan. Pursuant to the terms of defendants' contracts, Preferred Care was permitted to change plans annually, as it did here. Xerox had neither the obligation nor the power to force Preferred Care to include a particular term in its plans, or to provide a particular type or amount of coverage.

I also note that, while not articulated as a separate cause of action, running throughout much of plaintiff's papers is an underlying allegation that defendants concealed from plaintiff, or at least failed properly to inform her of, the fact that the rider would no longer be in effect as of January 1, 1998, and that coverage for skilled nursing care was being reduced. For example, in her affidavit in support of her cross-motion, plaintiff alleges that she was "duped" by Xerox into believing that the rider would be included in the 1998 Community Plan. Messmer Aff. ¶ 13. For the reasons already stated, I find this claim to be meritless. The record shows

---

**3.** Preferred Care states, and plaintiff does not appear to dispute, that no summary was provided for 1996. It is unclear whether any summary was provided for 1995. Assuming *arguendo* that there was a summary for 1995, and that it contained the same error as the 1994 summary, my decision on the present motions would be the same.

that defendants did so inform plaintiff, and they were free to modify the plans without plaintiff's prior consent.

In addition, it should be noted that plaintiff can make no claim that she somehow relied on defendants' alleged concealment to her detriment. Plaintiff does not allege, for instance, that any of the other plans being offered for 1998 included unlimited coverage for skilled nursing care, and that she would have opted for such a plan had she been aware that the rider would no longer be in effect. Furthermore, it is undisputed that plaintiff had actual notice of the reduction in coverage no later than April 6, 1998, when she received the written notice from Preferred Care of the termination of Mr. Messmer's benefits. Had a plan with more extensive coverage been offered by any provider for 1999, plaintiff could have sought coverage under such plan during the Fall 1998 open enrollment program. Had she done so, and since Mr. Messmer in fact continued to receive coverage from Preferred Care until February 1999, plaintiff would have suffered no injury as a result of defendants' alleged failure to inform her of the reduction in skilled nursing care benefits. Plaintiff elected to remain with Preferred Care, however, and, as indicated, there is no evidence before me that other providers' plans did offer greater coverage.

Thus, even if plaintiff had been given extensive, unmistakable notice that the rider was being eliminated for 1998, the outcome here would be no different. The most that she could have done in that situation would have been to object to the upcoming change, but for all the reasons stated above, defendants would have had no obligation to amend the Community Plan to continue to provide plaintiff and Mr. Messmer with unlimited coverage. Plaintiff therefore can show neither reliance nor any damage flowing therefrom with respect to defendants' allegedly inad-

equate notice of the deletion of the rider from the 1998 contract.

### CONCLUSION

Preferred Care's motion for summary judgment (Docket Item 14) and Xerox Corporation's motion for summary judgment (Docket Item 17) are granted. Plaintiff's cross-motion for summary judgment (Docket Item 21) is denied, and the complaint is dismissed.

IT IS SO ORDERED.